# STATE OF CONNECTICUT *v.* WILLIAM L. ANKERMAN
## (AC 23185)

Lavery, C. J., and DiPentima and Stoughton, Js.

Argued November 18, 2003—officially released February 17, 2004

*William L. Ankerman*, pro se, the appellant (defendant).

*Ronald G. Weller*, assistant state's attorney, with whom, on the brief, were *Michael Dearington*, state's attorney, and *John F. Blawie*, senior assistant state's attorney, for the appellee (state).

*Opinion*

STOUGHTON, J. The defendant, William L. Ankerman, appeals from the judgment of conviction, rendered

after a jury trial, of larceny in the first degree by embezzlement in violation of General Statutes §§ 53a-119 (1) and 53a-122 (a) (2). The defendant has raised twelve issues in his attack on his conviction. None of the claims has merit, and many of them were not preserved at trial. Accordingly, we affirm the judgment of the trial court.

The jury reasonably might have found the following facts from the evidence presented at the trial. The defendant was an attorney admitted to practice in Connecticut and a partner in the law firm of Ankerman and Smith (law firm). Leslie Forbes retained the law firm to represent his minor daughter, the victim, Elizabeth Forbes, who had been injured when struck by an automobile on November 3, 1992. The victim was fifteen years old at the time she was injured. The victim's claim for damages was settled for $100,000. On November 12, 1993, Philip A. Wright, Jr., judge of probate in Wallingford, where the Forbeses resided, appointed Leslie Forbes and his wife, Earldine R. Forbes, as guardians. The Probate Court approved the settlement. After the agreed on attorney's fees and certain expenses were deducted from the settlement amount, the sum of $66,110 was deposited in a bank account under the name of "Ankerman & Smith, Trustees for Elizabeth Forbes." The Probate Court required a bond of $30,000 of the guardians and, after additional expenses had been paid, on January 16, 1994, the guardians filed an inventory in the Probate Court showing net proceeds of the settlement of $59,039.45.

On or about October 21, 1994, attorney David C. Smith sent the guardians a check drawn on the trust account for $16,259.42 and advised them that he was retaining $49,894.32 "for payment or as a contingency for payment" for certain listed medical claims and Probate Court fees. Those included claims by Yale University School of Medicine (Yale) for $10,523 and Blue Cross/Blue Shield for $33,894.32. Those two claims, totaling

$44,417.32, were never paid, although certain other claims and fees were paid from the account. Yale ultimately brought an action against the victim's parents.

On November 8, 1994, the victim reached the age of eighteen. On January 6, 1996, Smith left the law firm to accept a position outside of Connecticut and informed the victim's parents that the defendant would continue to take care of the matter.[1] On September 1, 1996, after he had been defaulted for failure to plead in the Yale lawsuit, Leslie Forbes called the defendant for assistance. The defendant succeeded in opening the default and finally, after a trial, obtained judgment for Leslie Forbes and Earldine Forbes on May 14, 1998. In the meantime, between April and December, 1996, the defendant drew checks on the trust account payable to himself or to his practice, totaling $43,137.50. None of that money was ever paid to the victim or to her parents, but the bonding company ultimately was required to pay the bond. An accounting dated December 8, 1995, and signed by the guardians was sent to the Probate Court, but it was rejected because it was on a form for a decedent's estate, which was not the proper form. The accounting showed $33,940.32 on hand for distribution, but subject to a Blue Cross/Blue Shield lien in that amount and to a claim by Yale for $10,523.

The defendant never told the Forbes family that he had withdrawn the money and, at one point in 1997, told Earldine Forbes that he had all of her daughter's money. In December, 1997, no other accounting having been filed, Judge Wright scheduled a hearing for January 7, 1998, to consider removal of the guardians.[2] The

---

[1] The law firm of Ankerman and Smith was dissolved, and the defendant continued to practice law as a solo practitioner.

[2] Judge Wright testified that a final accounting should have been filed shortly after the victim became eighteen years old and, at that time, the funds should have been dispersed to her and the trust account closed.

defendant appeared at the hearing and stated that he had all of the funds and that he would prepare an accounting within two weeks. No accounting was filed, and on several subsequent dates hearings were scheduled and noticed at which the defendant failed to appear. Judge Wright suggested that the Forbeses obtain the assistance of another lawyer, and attorney Terence A. Zemetis was engaged thereafter to represent them.

Judge Wright scheduled a hearing for May 20, 1998, at which the Forbes family, Zemetis and the defendant appeared. The defendant produced a series of bank statements that revealed that the money that had been in the account was gone. Zemetis asked where the money was and the defendant replied: "It's gone, it's all gone. I'm sorry." He told Leslie Forbes that he was sorry that he had taken the victim's money. The defendant stated that he would attempt to obtain a mortgage loan to repay the money he had taken, but that he would need time to procure the funds.[3] Judge Wright ordered the defendant to file a final accounting by July 4, 1998.

On July 6, 1998, the defendant wrote a letter to the statewide grievance committee (committee), with a copy to Zemetis, in which he admitted to overdrawing the legal fees account and characterized his conduct as wrongdoing.[4] On December 6, 1998, he wrote to Zemetis proposing a plan to pay the net principal due plus interest, which he calculated to total $55,000. On April 8, 1999, the defendant testified before a grievance panel that he was deeply sorry that he had breached his duty

---

[3] The defendant was unable to obtain a mortgage loan.

[4] On the basis of the letter, the committee commenced a complaint against the defendant and presented it to the Superior Court. After a hearing, the court suspended the defendant from the practice of law for three years. This court recently affirmed the suspension. See *Statewide Grievance Committee* v. *Ankerman*, 74 Conn. App. 464, 812 A.2d 169, cert. denied, 263 Conn. 911, 821 A.2d 767 (2003).

as an attorney. After a jury trial, the defendant was convicted and sentenced. This appeal followed. Additional facts will be set forth as necessary.

## I

The defendant has raised twelve issues in his brief. As we have noted, several of the claims of error were not preserved properly. The record also reveals that the defendant has failed to request review pursuant to *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), or the plain error doctrine. See Practice Book § 60-5. "It is well established that generally this court will not review claims that were not properly preserved in the trial court. . . . The defendant's failure to address the four prongs of *Golding* amounts to an inadequate briefing of the issue and results in the unpreserved claim being deemed abandoned. . . . Finally, because the defendant has neglected to analyze his claim of plain error, he has failed to demonstrate a manifest injustice. . . . Accordingly, we decline to review his unpreserved claim." (Citations omitted; internal quotation marks omitted.) *State* v. *Harvey*, 77 Conn. App. 225, 230–31, 822 A.2d 360, cert. denied, 265 Conn. 906, 831 A.2d 252 (2003). In his brief, the defendant makes only passing references to *Golding* and has provided us with no analysis of its four prongs.[5] We will not engage in *Golding* or plain error review on the basis of such an inadequate brief. We will not, therefore, address those issues raised by the defendant that were not properly preserved in the trial court. With the foregoing principles in mind, we now address each of the defendant's remaining claims in turn.

## II

### A

In one of his many claims, the defendant asserts that the court improperly heard a case that may not have

---

[5] For example, the defendant's brief states that "[t]his [claim] is also reviewable under *State* v. *Golding*, [supra, 213 Conn. 233]."

taken place in the judicial district where the trial was held and therefore may have lacked subject matter jurisdiction.

"Subject matter jurisdiction involves the authority of a court to adjudicate the type of controversy presented by the action before it. . . . The question of whether the court has such jurisdiction, however, must be informed by the established principle that every presumption is to be indulged in favor of jurisdiction." (Internal quotation marks omitted.) *State* v. *Velky*, 263 Conn. 602, 605–606, 821 A.2d 752 (2003). Our review of claims concerning subject matter jurisdiction is plenary. See *Cohen* v. *Yale-New Haven Hospital,* 260 Conn. 747, 754, 800 A.2d 499 (2002).

The defendant posits that because the information charged that the crime was committed in the town of Wallingford or at other locations, the jury could have convicted him if the crime had occurred in another state. That argument is wholly without merit. The evidence showed that the victim lived in Connecticut, the bank where the account was maintained was in Connecticut and the defendant's actions in taking the victim's money occurred in Connecticut. It is clear that the court had subject matter jurisdiction.[6]

The defendant also claims that the crime may have occurred outside of the judicial district in which he was tried. "It is a well established rule that, outside the area of administrative appeals, venue is not a jurisdictional but a procedural question; consequently, venue, unlike subject matter jurisdiction, can be waived by the parties." *State* v. *Kelley,* 206 Conn. 323, 332, 537 A.2d 483 (1988). Thus, to the extent that the defendant is chal-

---

[6] "The Superior Court hearing a criminal matter acquires subject matter jurisdiction from its authority as a constitutional court of unlimited jurisdiction. Conn. Const., art. 5, § 1." (Internal quotation marks omitted.) *State* v. *Mack,* 55 Conn. App. 232, 236, 738 A.2d 733 (1999).

lenging venue, any such claim was waived by his failure to raise it at the trial. See *State* v. *Morrill*, 197 Conn. 507, 553, 498 A.2d 76 (1985).

B

The defendant next claims that the court abused its discretion by limiting questions to prospective jurors during voir dire examination. "It is well established that the trial court is vested with broad discretion to determine the extent and form of the voir dire examination." *State* v. *Faust*, 237 Conn. 454, 462, 678 A.2d 910 (1996). Voir dire that touches on the facts of the case should be discouraged. *State* v. *Rios*, 74 Conn. App. 110, 117, 810 A.2d 812 (2002), cert. denied, 262 Conn. 945, 815 A.2d 677 (2003).

The defendant complains of two rulings limiting his examination and claims that they were harmfully prejudicial to him. He has not set out those questions in accordance with our rules, leaving this court to search through the filed transcripts.

During the examination of the third potential juror, defense counsel stated that the state would introduce evidence that the larceny had occurred while the defendant was acting as an attorney, and asked whether the potential juror could be fair and impartial in such a case. An objection that the question concerned the evidence to be introduced was overruled, but before the next venireperson was called, counsel addressed the question again. The court agreed that a question concerning an attorney accused of embezzlement in the course of his duties as an attorney would be getting into the evidence. Defense counsel thereafter refrained from asking that question, but did question potential jurors on their ability to remain impartial in a case in which the defendant was an attorney charged with embezzlement. We cannot say that the court abused its discretion when it ruled that such questions were

improper because they touched on the facts of the case. See id., 117–18.

The other claim concerning the voir dire arose when it became apparent that some of the venirepersons previously had had jury service. Defense counsel was not allowed to ask those persons what the verdict had been in the cases on which they had served. Our Supreme Court previously has held that it is not an abuse of discretion to disallow such questions. See *State* v. *Couture*, 218 Conn. 309, 317–19, 589 A.2d 343 (1991).

We discern no prejudice to the defendant resulting from those rulings and conclude that the court did not abuse its discretion in ruling as it did.

C

The defendant next claims error in various evidentiary rulings by the court. We have frequently held that a court has broad discretion in ruling on the admissibility and relevance of evidence. *State* v. *Gombert*, 80 Conn. App. 477, 488, 836 A.2d 437 (2003). We will refer to additional facts where necessary.

1

The defendant first claims that the court improperly denied his motion to suppress the letter he wrote to the committee on July 6, 1998. Prior to commencement of the trial, the court, *Lager, J.*, held a hearing on the defendant's motion to suppress. Certain facts were stipulated to, including the following: When the defendant wrote the letter, he had not been ordered to do so by the probate judge, the committee itself or the committee's counsel; when he wrote the letter, the defendant was not under investigation by the committee; and when he wrote the letter, the defendant was not under arrest or in custody, and the letter was not the product of an interrogation.

In the letter, the defendant stated that he was writing to alert the committee to a serious problem with his actions. He described the settlement in the Forbes case and stated that after payments to the guardians and medical providers, there remained approximately $44,000 in the account. He wrote that from that sum, checks were drawn to cover legal services, and he stated that he had reported to the Probate Court that he had overdrawn the legal fees account by about $35,000. He acknowledged liability for the excess payments, offered as a possible explanation that he had suffered a stroke in 1993 and had had other subsequent physical problems, and stated that he was shocked by what he had done.

The defendant filed a motion to suppress the statements in his letter under both the fifth amendment to the United States constitution and article first, § 8, of the Connecticut constitution. Because he claimed no greater protection under the Connecticut constitution, the court properly considered the claim under the federal constitution. See *State* v. *Green*, 261 Conn. 653, 656–57 n.7, 804 A.2d 810 (2002).

The claim made by the defendant before the trial court and repeated in his brief to this court was that he was obligated under certain ethical duties imposed by the Rules of Professional Conduct and our rules of practice to report to the committee what he had done. The defendant argues, therefore, that his statement was compelled. In essence, his claim is that the requirement of rule 8.3 (a)[7] of the Rules of Professional Conduct, that a lawyer knowing of the dishonesty of another lawyer must inform the appropriate disciplinary author-

[7] Rule 8.3 (a) of the Rules of Professional Conduct provides in relevant part that "[a] lawyer having knowledge that another lawyer has committed a violation of the Rules of Professional Conduct that raises a substantial question as to that lawyer's honesty, trustworthiness or fitness as a lawyer in other respects, shall inform the appropriate disciplinary authority. . . ."

ity, required that he report his own dishonesty. The defendant further contends that because the committee is an arm of the court, it is sufficiently linked to the state so that his statement was one compelled by the state.

The defendant provided no authority for those contentions and our research has not revealed any.[8] The court decided, and we agree, that there is no support for those contentions in either the Rules of Professional Conduct or our rules of practice. There can be no doubt that a lawyer is bound by the Rules of Professional Conduct and subject to discipline for a breach of those duties. Furthermore, a lawyer is bound to try to protect our profession by reporting violations *on the part of other lawyers* that come to his or her attention.

In the present case, the defendant was not under a duty to report his own misconduct to the committee. We agree, therefore, with the court that the letter written by the defendant was voluntary and not the result of any state compulsion. In the absence of any compulsion, the statements contained in the letter were voluntary. "Voluntary statements of any kind are not barred by the fifth amendment." (Internal quotation marks omitted.) *State* v. *Medina*, 228 Conn. 281, 290, 636 A.2d 351 (1994).

2

The defendant next claims that the court improperly admitted into evidence a letter that he wrote on December 6, 1998, to Zemetis, proposing a plan to pay $55,000 to the victim. The letter was admitted into evidence over objection that it was an offer to compromise and inadmissible under § 4-8 of the Connecticut Code of

---

[8] In its brief, the state cites Connecticut Bar Association Committee on Professional Ethics, Informal Opinion No. 97-38 (1997), which provides in relevant part that "[i]n light of the fact that *the text of Rule 8.3 (a) refers to 'another lawyer,' Rule 8.3 does not contain any requirement that a lawyer report himself or herself. . . .*" (Emphasis added.)

Evidence.[9] Section 4-8 provides that evidence of an offer to compromise is inadmissible on the issues of liability and the amount of the claim, but excepts, among other things, admissions of liability made by a party. Leaving aside whether, as claimed by the state, that rule does not apply in a criminal trial,[10] the letter clearly was an admission of liability by a party, the defendant. "[S]tatements made out of court by a party-opponent are universally deemed admissible when offered against him; 4 Wigmore, Evidence (Chadbourn Rev. 1972) § 1048, p. 2; so long as they are relevant and material to issues in the case. . . . [T]he vast weight of authority, judicial, legislative, and scholarly, supports the admissibility without restriction of any statement of a party offered against that party at trial." (Citation omitted; internal quotation marks omitted.) *State* v. *Correa*, 57 Conn. App. 98, 111–12, 748 A.2d 307, cert. denied, 253 Conn. 908, 753 A.2d 941 (2000); see also *State* v. *Stepney*, 191 Conn. 233, 250, 464 A.2d 758 (1983), cert. denied, 465 U.S. 1084, 104 S. Ct. 1455, 79 L. Ed. 2d 772 (1984). We conclude, therefore, that the court did not abuse its discretion in admitting the letter into evidence.

### 3

The defendant next claims that the court improperly admitted into evidence an amended final accounting

[9] Connecticut Code of Evidence § 4-8 provides: "(a) General Rule. Evidence of an offer to compromise or settle a disputed claim is inadmissible on the issues of liability and the amount of the claim.

"(b) Exceptions. This rules does not require the exclusion of:

"(1) Evidence that is offered for another purpose, such as proving bias or prejudice of a witness, refuting a contention of undue delay or proving an effort to obstruct a criminal investigation or prosecution, or

"(2) statements of fact or admissions of liability made by a party."

[10] Our Supreme Court has stated that "[t]he policy of protecting offers of compromise in civil cases does not extend to efforts to stifle criminal prosecution by buying off the prosecuting witness or victim." (Internal quotation marks omitted.) *State* v. *Milum*, 197 Conn. 602, 613, 500 A.2d 555 (1985). Furthermore, one commentator has noted that § 4-8 contains terms that have a civil but not criminal connotation and that it is unclear whether § 4-8 of the Connecticut Code of Evidence applies to criminal cases. See C. Tait, Connecticut Evidence (3d Ed. 2001) § 4.26.1, p. 263.

prepared by Zemetis and signed by the guardians. Zemetis testified that he had prepared the document from information supplied by the Probate Court, and that he had no other files and had received no information from the defendant. Defense counsel objected to the offer as having minimal relevance, and as inaccurate and prepared with less than total knowledge. The court overruled the objection, finding that the document was relevant, and that its shortcomings and the reasons therefor were matters for the jury's consideration. We agree with the court's conclusion.

The account was the final event in winding up the victim's estate and therefore was relevant. "We repeatedly have stated that evidence is relevant if it has a logical tendency to aid the trier in the determination of an issue. . . . Evidence is not rendered inadmissible because it is not conclusive. All that is required is that the evidence tend to support a relevant fact even to a slight degree, so long as it is not prejudicial or merely cumulative." (Internal quotation marks omitted.) *State v. Lugo*, 266 Conn. 674, 693–94, 835 A.2d 451 (2003).

In the present case, the determination reserved for the jury was whether the defendant had embezzled funds from the trust account. The final accounting provided the jury with evidence of the closing of that account. We have stated that "[t]he state may properly present evidence to show the sequence of events as they unfold." *State v. McNair*, 54 Conn. App. 807, 815, 738 A.2d 689, cert. denied, 251 Conn. 913, 739 A.2d 1249 (1999). Thus, it is clear that the final accounting was relevant and admissible, and that any of its admitted inaccuracies, elicited during cross-examination, were matters pertinent to whatever weight the jury might assign to them.

4

The defendant next claims that the court improperly permitted the prosecutor to inquire as to why the insur-

ance company had paid on the probate bond.[11] During the trial, Zemetis testified that he was representing the Forbes family in related civil matters, and that a claim was made and collected against the bond. When the prosecutor asked why the bond was paid, an objection was initially sustained as calling for hearsay. Defense counsel, however, had brought out during his cross-examination of the victim that she had received $30,000 from an insurance company. The prosecutor claimed that this had opened the door to further inquiry, and the objection was overruled.

Our Supreme Court has stated that "[t]he party who initiates discussion on the issue is said to have opened the door to rebuttal by the opposing party. Even though the rebuttal evidence would ordinarily be inadmissible on other grounds, the court may, in its discretion, allow it where the party initiating inquiry has made unfair use of the evidence." (Internal quotation marks omitted.) *State* v. *Ceballos*, 266 Conn. 364, 405, 832 A.2d 14 (2003). In the present case, Zemetis' testimony was in response to the defendant's questioning of the victim. Zemetis testified that the bond was paid because the person who had custody of the funds had misused them. In light of the obvious suggestion that the victim had been paid some or all of the money, we cannot say that the court abused its discretion.

5

The defendant next claims that the court improperly sustained an objection to one of his answers on cross-examination as nonresponsive to the question that had been posed. The defendant took the witness stand in his defense. The following exchange took place during his cross-examination:

---

[11] The defendant also claimed that Zemetis was incompetent to testify as to why the money was paid. That claim is without merit, as it was Zemetis who made the claim on the bond and, therefore, knew why it had been paid.

"[The Prosecutor]: The money is gone, isn't it, sir?

"The Defendant: It's not in that account.

"[The Prosecutor]: It's gone, is it not, sir? Tell us where it is, if it's not in this account?

"The Defendant: I have a blank check here that I am—

"[The Prosecutor]: I object, it's not responsive.

"[Defense Counsel]: It is responsive.

"The Court: It's not responsive. Pose your question."

Defense counsel subsequently explained in an offer of proof that the defendant had a check in the amount of $13,251, payable to himself, which was available to the victim if they could agree on the amount owed. That, however, was not relevant to the charge that he had stolen the money in the first place, and the court did not abuse its discretion in its ruling.

### D

Finally, the defendant claims that the evidence was insufficient for conviction. He filed a motion for a judgment of acquittal at the end of the state's case and again at the conclusion of the evidence. He claimed that the state had failed to prove that he wrongfully had taken the money from the account and that the amount was more than $10,000.

The standard of review on a claim of insufficiency of the evidence has been stated frequently. First, we construe the evidence in the light most favorable to sustaining the verdict, and then we determine whether, on the facts so construed, together with the inferences reasonably drawn therefrom, the cumulative force of the evidence established guilt beyond a reasonable doubt. *State* v. *Gombert,* supra, 80 Conn. App. 494–95.

References to the evidence recited heretofore demonstrate that this standard has been met fully. Accordingly, we conclude that the court properly denied the defendant's motions for a judgment of acquittal.

The judgment is affirmed.

In this opinion the other judges concurred.