## STATE OF CONNECTICUT v. BRIAN EBRON
### (SC 17914)

Norcott, Palmer, Vertefeuille, Zarella and McLachlan, Js.

---

Argued March 24—officially released July 28, 2009

*Mary Beattie Schairer*, special public defender, for the appellant (defendant).

*Ronald G. Weller*, senior assistant state's attorney, with whom, on the brief, were *Gail P. Hardy*, state's attorney, and *Herbert E. Carlson, Jr.*, supervisory assistant state's attorney, for the appellee (state).

*Opinion*

NORCOTT, J. The defendant, Brian Ebron, appeals directly[1] from the judgment of conviction, rendered after a jury trial, of intentional manslaughter in the first degree with a firearm in violation of General Statutes § 53a-55a (a).[2] On appeal, the defendant claims that the

---

[1] The defendant appeals directly to this court pursuant to General Statutes § 51-199 (b) (3).

[2] General Statutes § 53a-55a (a) provides: "A person is guilty of manslaughter in the first degree with a firearm when he commits manslaughter in the first degree as provided in section 53a-55, and in the commission of such offense he uses, or is armed with and threatens the use of or displays or represents by his words or conduct that he possesses a pistol, revolver, shotgun, machine gun, rifle or other firearm. No person shall be found guilty of manslaughter in the first degree and manslaughter in the first degree with a firearm upon the same transaction but such person may be charged and prosecuted for both such offenses upon the same information."

trial court improperly: (1) precluded him from questioning prospective jurors about their ability and willingness to follow instructions concerning the law of self-defense; (2) failed to give a jailhouse informant credibility instruction pursuant to *State* v. *Patterson*, 276 Conn. 452, 886 A.2d 777 (2005), with respect to one of the state's key witnesses; (3) instructed the jury about the retreat doctrine; and (4) failed to instruct the jury, sua sponte, on the doctrine of defense of premises. We disagree with these claims and, accordingly, we affirm the judgment of the trial court.

The record reveals the following facts, which the jury reasonably could have found, and procedural history. Shortly after midnight on November 18, 2003, Tameika Moore went to visit a friend who lived in an apartment at 784–786 Capitol Avenue in Hartford. When she arrived at the apartment, Moore was surprised to find the victim, nineteen year old Shomari Greene, there visiting that same friend. Moore asked the victim to leave and proceeded to escort him down the stairs and out of the building. While passing through the first floor hallway of the building, Moore and the victim encountered Lawanne Harris (Lawanne), the defendant's girlfriend, who lived in an apartment off that hallway with the defendant, her mother, Yolanda Harris (Yolanda), and her four year old sister, Destiny. The victim and Lawanne argued in the hallway for approximately thirty minutes, and the defendant and Yolanda subsequently joined in the altercation after Lawanne summoned them to tell them about a person who was "disrespecting" her. Thereafter, the defendant and the victim proceeded to threaten each other, with the victim, who was visibly

General Statutes § 53a-55, which is cross-referenced by § 53a-55a (a), provides in relevant part: "(a) A person is guilty of manslaughter in the first degree when: (1) With intent to cause serious physical injury to another person, he causes the death of such person or of a third person . . . ."

intoxicated,[3] stating that he had "people, too" and would come back to "shoot up the place." The defendant then pointed a silver revolver at the victim and pulled the trigger, but the gun failed to fire. Moore and the victim then left the building.

Shortly thereafter, however, the victim walked back to the apartment building, and punched a hole in the glass adjacent to the building's front door in an attempt to open that door from the inside, because it had locked automatically behind him. After the victim reentered the front hallway, the defendant then shot the victim in the face with the revolver,[4] causing his death.[5] The defendant then fled from the scene by jumping out of the kitchen window of his apartment into the alley between buildings, pausing in the process to point his gun at Maria Ayala, a neighbor who had heard the initial altercation from her apartment, and then had heard the gunshot after leaving her apartment and seeing the victim reenter the building.[6]

Thereafter, the state charged the defendant with murder in violation of General Statutes § 53a-54a (a). The

[3] At the time of his death, the victim's blood alcohol content was 0.19 percent.

[4] The shooting itself was not witnessed, and the defendant's gun was not recovered. The jury's finding that the defendant shot the victim is supported by the testimony of Margaret Clarke, a mother figure to the defendant. Clarke testified regarding the defendant's confession to her that he had shot the victim because the victim had disrespected Lawanne. Additionally, Detective Jerry Bilbo of the Hartford police department testified that the police found, in the defendant's apartment, a partially empty box of Winchester .38 Special bullets, which was the type of bullet used to kill the victim.

[5] Specifically, the bullet traveled from the entry point in the victim's temple into his chest, where it lacerated major arteries, causing internal bleeding that resulted in his death.

[6] Ayala went to the scene several minutes after hearing the gunshot, witnessed the victim lying on the hallway floor, and called the police for emergency assistance. After running into the alleyway to see whether Lawanne and Destiny were safe in the apartment, Ayala asked Lawanne where the defendant was, at which point the defendant jumped out of the window and pointed the revolver at Ayala before fleeing the scene.

defendant elected a jury trial, and a jury was selected before the trial court, *Espinosa, J.* The case was then tried to the jury before the trial court, *Mullarkey, J.* The jury rejected the defendant's claim of self-defense and returned a verdict finding him not guilty of murder, but guilty of the lesser included offense of intentional manslaughter with a firearm in violation of § 53a-55a (a). Judge Mullarkey then rendered a judgment of conviction in accordance with the jury's verdict and sentenced the defendant to thirty-two years imprisonment. This appeal followed. See footnote 1 of this opinion.

On appeal, the defendant claims that the trial court improperly: (1) limited his voir dire questioning of the prospective jurors about whether they could follow the court's instructions regarding self-defense; (2) failed to give an instruction pursuant to *State* v. *Patterson,* supra, 276 Conn. 452, with respect to Moore's credibility; (3) instructed the jury about the retreat doctrine; and (4) failed to instruct the jury, sua sponte, on the doctrine of defense of premises. We address each claim in turn, and set forth additional facts and procedural history where necessary.

I

The defendant first claims that Judge Espinosa improperly precluded him from questioning the venirepersons about specific defenses during voir dire, and then further erred when she subsequently modified that ruling to permit him to ask them only whether it is ever justifiable to take a life. The defendant contends that this restriction was harmful to him because he needed to ensure "that the jurors who sat on the case were not automatically prejudiced against [his] defense." The defendant argues that the venirepersons' answers to the question asking whether it is ever justifiable to take a life demonstrated that the permissibility of taking another's life is a controversial topic and that "there is

a strong likelihood that there were jurors on the final jury who would *never* follow the court's instructions on justification, and thus were automatically biased against [him]." (Emphasis in original.) In response, the state contends that the defendant's claim is unpreserved for appellate review because he never objected to any ruling made by the trial court with respect to the scope of voir dire and, indeed, "eagerly adopted the court's suggestion for future questioning." Alternatively, the state argues that the trial court did not abuse its discretion because the questions that it had permitted enabled the defendant to uncover any relevant prejudices that the prospective jurors may have harbored, and also complied with the well established restriction on voir dire questions that touch on the specific facts of cases. We agree with the state and conclude that the trial court did not abuse its discretion by permitting the defendant to ask the venirepersons whether it was ever permissible to take a life, rather than permitting more specific questions about self-defense.[7]

The record reveals the following additional facts and procedural history. On the second day of jury selection, while questioning venireperson C.L.,[8] counsel for the

[7] We disagree with the state's reliance on, inter alia, *State* v. *Fabricatore*, 281 Conn. 469, 481, 915 A.2d 872 (2007), and *State* v. *Duncan*, 96 Conn. App. 533, 560, 901 A.2d 687, cert. denied, 280 Conn. 912, 908 A.2d 540 (2006), in support of its argument that the defendant failed to object to the trial court's voir dire ruling and, furthermore, that the defendant affirmatively waived this claim by utilizing the justification question suggested by the trial court. Although the better practice would have been for the defendant to claim the issue specifically after the trial court's ruling, our review of the record reveals that the defendant argued to the trial court the necessity of questioning the venirepersons about self-defense, and we conclude that appellate review of this claim should not, therefore, operate unfairly to surprise either the state or the trial court. Thus, the defendant's compliance with the trial court's suggestion was not an expression of satisfaction with the trial court's ruling akin to induced error that would waive a claim on appeal.

[8] To protect the privacy of the venireperson we refer to the individual by initials only. See *State* v. *Thornton*, 112 Conn. App. 694, 700 n.10, 963 A.2d 1099, cert. denied, 291 Conn. 914, 969 A.2d 175 (2009).

defendant asked: "If Her Honor gives you an instruction on a defense to murder could you follow an instruction on defense for murder?" The trial court and the prosecutor did not interject at this time. After C.L. was accepted as a juror, the trial court stated, "I think that I had mentioned at sidebar that we were not going to get into defenses. You asked the juror would he follow an instruction on defense to murder. There are many instructions I'm going to give that might or might not apply to this case. So that's not an appropriate question."[9] Counsel for the defendant then advised the court that he had "tried to keep it very generic because . . . the . . . jurors are being questioned as to whether or not just the charge of murder would affect them. And [his] concern is that somebody may say that, no, they're . . . not concerned about the charge, but they may not accept that there is a defense to murder. And . . . from [his] knowledge of the case [he is] certain that Your Honor will be giving [a] defense charge on murder and so [he] tried to be very generic without saying self-defense or anything else." The trial court then ruled that counsel could "ask . . . a more general question, such as, *do you believe that it's ever justified to take a life*"; (emphasis added); and defense counsel then indicated that he would do that in questioning future prospective jurors.

Thereafter, counsel for the defendant asked that question of nearly every remaining venireperson, and each one who was selected as a juror confirmed that there were circumstances under which taking the life of another would be acceptable, some, specifically G.S.,

---

[9] The previous day, which was the first day of jury selection, as he questioned B.D., the first panel member, the prosecutor stated that "self-defense, or as it more—as it's legally called defense of person, might be raised in this case." Before B.D. could answer any questions on this topic, the trial court asked to see counsel at sidebar, but that particular exchange and ruling were not put on the record at that time. Four jurors were selected that first day, three of whom, B.D., C.F. and C.R., sat on the final jury.

K.M., C.R., D.A., J.D. and C.D., stating so in more general terms,[10] and others, specifically D.D., J.W., P.C., R.P., J.J. and S.D., stating specifically that self-defense was

[10] We note the following colloquies took place between counsel for the defendant and these specific jurors. With respect to juror G.S.:

"Q. And we're not looking for machines. I don't know that a computer could ever give us justice. Murder involves the taking of a life, that's what the state alleges. Do you believe that the taking of a life [is] ever justified?

"A. Under certain circumstances, yes.

"Q. So even though this is a murder trial you would still be able to listen to all of the evidence before you could come to a conclusion? You'd keep an open mind throughout testimony; would that be fair to say?

"A. Yeah."

With respect to juror K.M.:

"Q. Do you have any personal belief that because somebody died somebody has to pay for it because they died unnaturally?

"A. Um, no.

"Q. Okay. Along with that, do you believe that there's ever any circumstances justifying the taking of another's life, any circumstances?

"A. Any at all?

"Q. Yes, any at all?

"A. Yes."

With respect to juror C.R.:

"Q. Okay. Can you think of any circumstances under which it would be acceptable to take a human life?

"A. That's a tough question. I'm a parent so in that type of—I don't—I can't, no.

"Q. You can't?

"A. No. I think—I don't think it would be the right thing, but I could see where it could happen under certain circumstances. And I'm not saying it's the proper thing or the correct thing, but I—human nature and put in a certain position I can't say that I wouldn't do it or another person. I can't say it's right or wrong until I'd be put into that position."

With respect to juror D.A.:

"Q. Okay. Do you believe that there are ever any circumstances to justify the taking of a human life?

"A. Yes."

With respect to juror J.D.:

"Q. Can you think of any circumstances under which it would be justified to take a human life?

"A. Yes."

With respect to juror C.D.:

"Q. Do you believe that there are ever any circumstances justifying the taking of a human life?

"A. Yes."

an acceptable justification for taking a human life.[11]
Those venirepersons who gave contrary answers were
excused from service.

---

[11] We note the following colloquies took place between counsel for the
defendant and these specific jurors. With respect to juror D.D.:

"Q. Do you have any feelings that there are ever any circumstances to
justify the taking of a human life?

"A. In peace?

"Q. Any circumstances.

"A. Well, obviously, there's war. I don't know if I would classify myself
as a pacifist, but we are at war, we have been at war. I think to defend
one's self one has to protect one's self. I know I could never pass the—
what was it, the conscientious objector? *I mean, if someone tried to attack
me, I would defend myself and if someone attacked my home, I would
defend myself and if someone attacked my country, I would defend myself.*
So I believe . . . that lives might be lost in an attempt to protect one's self.

"Q. Thank you." (Emphasis added.)

With respect to juror J.W.:

"Q. Okay. Do you believe that there are ever any circumstances that justify
the taking of a human life?

"A. Um, I think that's kind of a yes and no answer. Um, if someone was
to come into my home, my family and want to injure or harm someone in
my family I would say, yes. But if it's—I'm maybe at a friend's house or
something and, you know, someone may bump me, push me or whatever,
no, I don't see that that's an issue—you have the right to take their life."

Indeed, juror J.W. later responded to a follow-up question from the prose-
cutor, and stated: "I'm more of like, home security. If someone is coming
into your home you have your family there and, you know, you have to
defend your home and your family. Yes, I feel that you are capable to defend
yourself with a weapon, but otherwise, you know, that's—I can't see anything
else other than that."

With respect to juror P.C.:

"Q. Again, you understand what the charge is. Do you believe that there
are any circumstances that would justify the taking of a human life?

"A. Absolutely not.

"Q. You can't think of any circumstances?

"A. The only circumstance I can think of would be war or self-defense
. . . ."

With respect to juror R.P.:

"Q. Okay. Can you think of any circumstances that would justify the
taking of a human life?

"A. I can see circumstances where you're protecting someone else's life.
I'm sure that might—and police, you know, run into situations like that on
a—you know, not a . . . regular basis, but it happens. I think that would
be a reason. Maybe protecting your children. You know, that might be
another reason."

With respect to juror J.J.:

"Okay. Can you think of any circumstances justifying the taking of a
human life?

"A. Self-defense."

With respect to juror S.D.:

"Okay. Can you think of any situations, any circumstances under which
the taking of a human life would be justified?

"A. Um, times of war, immediate self-preservation."

"The constitution of Connecticut is unique among state constitutions in providing an inviolate right in criminal cases to question each venireperson outside the presence of other members of the venire panel. . . . The purpose of such voir dire is to enable the court to determine whether the venireperson is qualified to serve on the jury and to assist the parties in the informed exercise of peremptory challenges." (Citations omitted.) *State* v. *Thornton*, 112 Conn. App. 694, 695, 963 A.2d 1099 (discussing Conn. Const., art. I, §§ 8 and 19), cert. denied, 291 Conn. 914, 969 A.2d 175 (2009).

"We have stated that, as a practical matter, the wide range of cases submitted to juries, along with the attendant impossibility of establishing a set pattern of voir dire questions, requires that the trial court be vested with broad discretion in determining the extent of the voir dire examination. . . . [I]n exercising its discretion, the court should grant such latitude as is reasonably necessary to accomplish the twofold purpose of voir dire: to permit the trial court to determine whether a prospective juror is qualified to serve, and to aid the parties in exercising their right to peremptory challenges. . . . It is well settled that the court's rulings . . . will not be disturbed unless the court has clearly abused its discretion or it appears that prejudice to one of the parties has resulted. . . .

"[I]f there is any likelihood that some prejudice is in the juror's mind which will even subconsciously affect his decision of the case, the party who may be adversely affected should be permitted questions designed to uncover that prejudice. . . . The latitude . . . afforded the parties in order that they may accomplish the purposes of the voir dire [however] is tempered by the rule that [q]uestions addressed to prospective jurors involving assumptions or hypotheses concerning the evidence which may be offered at the trial . . . should be discouraged . . . . [A]ll too frequently such inquir-

ies represent a calculated effort on the part of counsel to ascertain before the trial starts what the reaction of the venire[person] will be to certain issues of fact or law or, at least, to implant in his mind a prejudice or prejudgment on those issues. Such an effort transcends the proper limits of the voir dire and represents an abuse of the statutory right of examination." (Citations omitted; internal quotation marks omitted.) *State* v. *Lugo*, 266 Conn. 674, 683–84, 835 A.2d 451 (2003); see also General Statutes § 54-82f;[12] Practice Book § 42-12.[13]

Thus, we afford trial courts wide discretion in their supervision of voir dire proceedings "to strike a proper balance between [the] competing considerations"; *State* v. *Pollitt*, 205 Conn. 61, 75, 530 A.2d 155 (1987); but at the same time recognize that, as a practical matter, "[v]oir dire that touches on the facts of the case should be discouraged." *State* v. *Ankerman*, 81 Conn. App. 503, 510, 840 A.2d 1182, cert. denied, 270 Conn. 901, 853

[12] General Statutes § 54-82f provides: "In any criminal action tried before a jury, either party shall have the right to examine, personally or by his counsel, each juror outside the presence of other prospective jurors as to his qualifications to sit as a juror in the action, or as to his interest, if any, in the subject matter of the action, or as to his relations with the parties thereto. If the judge before whom the examination is held is of the opinion from the examination that any juror would be unable to render a fair and impartial verdict, the juror shall be excused by the judge from any further service upon the panel, or in the action, as the judge determines. The right of such examination shall not be abridged by requiring questions to be put to any juror in writing and submitted in advance of the commencement of said action."

[13] Practice Book § 42-12 provides: "Each party shall have the right to examine, personally or by counsel, each juror outside the presence of other prospective jurors as to qualifications to sit as a juror in the action, or as to interest, if any, in the subject matter of the action, or as to relations with the parties thereto. If the judicial authority before whom such examination is held is of the opinion from such examination that any juror would be unable to render a fair and impartial verdict, such juror shall be excused by the judicial authority from any further service upon the panel, or in such action, as the judicial authority determines. The right of such examination shall not be abridged by requiring questions to be put to any juror in writing and submitted in advance of the commencement of the trial."

A.2d 520, cert. denied, 543 U.S. 944, 125 S. Ct. 372, 160 L. Ed. 2d 256 (2004); see *State* v. *Lugo*, supra, 266 Conn. 690 (concluding that "questions concerning gangs in general were sufficient to uncover juror bias for or against the Latin Kings [gang] . . . [and] it was reasonable for the trial court to conclude that questions specifically concerning the Latin Kings [gang] would improperly have afforded defense counsel an opportunity to gauge how each prospective juror would view his defense"); *State* v. *Pollitt*, supra, 75 ("By prohibiting the voir dire question posed by defense counsel regarding 'mistaken identification,' the [trial] court may properly have endeavored to prevent a prejudicial assumption about the case from infecting the jury. The questions nevertheless permitted by the [trial] court regarding witness credibility, honest mistake, identification and alibi were adequate alternatives for discerning whether prejudice existed in the jurors' minds on those issues."); *State* v. *Thornton*, supra, 112 Conn. App. 706–707 (trial court did not abuse discretion by permitting defendant to question prospective jurors about their views on "homosexuality in general," but not more specifically about whether persons might be struggling with their sexual identities); *State* v. *Sheets*, 40 Conn. App. 328, 330, 332, 671 A.2d 366 (trial court properly precluded defense counsel from asking venirepersons whether they could treat separately two charged robberies "if they knew that the same clerk was working at the store during both robberies" because "defense counsel had no right to ask jurors their opinions on an assumed set of facts"), cert. denied, 237 Conn. 903, 674 A.2d 1334 (1996).

The defendant claims, however, that whether prospective jurors may be questioned during voir dire about self-defense is an issue of first impression for this court. The defendant further contends that *State* v. *Scuilla*, 26 Conn. App. 165, 599 A.2d 741 (1991), cert. denied,

221 Conn. 908, 600 A.2d 1362 (1992), which is relied on by the state, is both distinguishable on the ground that self-defense was a collateral issue in that case, and in any event, that *Scuilla* was wrongly decided. In *State v. Scuilla*, supra, 172, the defendant claimed, inter alia, that the trial court improperly had precluded his counsel from asking "several prospective jurors if they personally believed they would have the right to use self-defense to protect themselves in any instance in which they felt threatened." The Appellate Court rejected the defendant's claim that the trial court "so severely restricted the scope of questioning as to force [the defendant] to go forward without having been able effectively to ferret out possible prejudices of the jury"; id., 173; because "[p]rospective jurors told counsel they would be able to evaluate witnesses' testimony fairly and objectively, and would follow the court's instructions in accordance with the law, despite any negative feelings they may have had about narcotics or self-defense. Although the court limited inquiries in certain areas, we cannot say it did not allow counsel sufficient latitude to expose possible prejudices." Id., 173–74. We agree with the state that *Scuilla* is persuasive authority in support of its argument that the trial court in the present case did not abuse its discretion by precluding defense counsel from asking venirepersons specifically about self-defense.[14] In our view, the only collateral

---

[14] We also agree with the state that *Scuilla* is consistent with the decisions of other jurisdictions on this topic, the majority of which has concluded that jurors need not be questioned during voir dire directly about their views on self-defense. See *United States* v. *Robinson*, 475 F.2d 376, 380–81 (D.C. Cir. 1973); *Stewart* v. *State*, 262 Ga. App. 426, 427–28, 585 S.E.2d 622 (2003); *People* v. *Karim*, 367 Ill. App. 3d 67, 92–93, 853 N.E.2d 816 (2006), appeal denied, 222 Ill. 2d 616, 862 N.E.2d 237 (2007); *Commonwealth* v. *Morales*, 440 Mass. 536, 548–49, 800 N.E.2d 683 (2003); *People* v. *Rodriguez*, 240 App. Div. 2d 683, 659 N.Y.S.2d 495, appeal denied, 90 N.Y.2d 909, 686 N.E.2d 233, 663 N.Y.S.2d 521 (1997); *State* v. *Frederiksen*, 40 Wash. App. 749, 754–56, 700 P.2d 369, review denied, 104 Wash. 2d 1013 (1985); *Jahnke* v. *State*, 682 P.2d 991, 1002 (Wyo. 1984), overruled on other grounds by *Vaughn* v. *State*, 962 P.2d 149 (Wyo. 1998); see also *State* v. *Camarillo*, 106 Idaho 310, 312–13, 678 P.2d 102 (App. 1984) (trial court properly permitted broad questioning

issue described by the trial court in *Scuilla* was narcotics use by the defendant and the victim therein; that description did not apply to the defendant's claim of self-defense by pulling away from a curb at high speed and entering a highway with the victim hanging from the side of his car. Id., 172. Moreover, the conclusion in *Scuilla* that the trial court had not abused its discretion therein provides even stronger support for the state in the present case, because the defendant herein had the opportunity to question prospective jurors more specifically regarding whether circumstances existed under which it would be permissible to take a life, and some venirepersons cited self-defense specifically as one such circumstance. See footnotes 10 and 11 of this opinion.

on self-defense without influence of facts of case); but see *Everly v. State*, 271 Ind. 687, 690–91, 395 N.E.2d 254 (1979); *State v. Caldwell*, 251 La. 780, 784 n.1, 206 So. 2d 492 (1968) (stating in dicta that trial court improperly precluded voir dire questions about self-defense if they "were propounded for the purpose of ascertaining the attitudes of the prospective jurors concerning self defense as such"); *People v. Taylor*, 195 Mich. App. 57, 59, 489 N.W.2d 99 (1992) (per curiam) ("refusal of trial court to ask any questions concerning the subject of self-defense and juror attitudes toward the use of deadly force unduly restricted voir dire"); *State v. Brown*, 547 S.W.2d 797, 800 (Mo. 1977) ("[D]efense counsel made known to the trial court [that] he wanted to learn if the veniremen's minds were open or closed to the principle that the burden of proof would be on the state to disprove self-defense. This was vital to the defendant's right to have an unbiased jury. The trial court erred in barring [the] defendant from exercising this right."). We note, moreover, that the broader questioning that the trial court *did* permit in the present case, namely, the questions about whether there were circumstances under which it would be permissible to take a life, and whether the jurors could apply the law impartially as instructed by the trial court, addresses the concerns raised by the courts that have permitted questions of prospective jurors about self-defense specifically. See *Everly v. State*, supra, 689 ("each party has a right to discover whether prospective jurors have fixed opinions or conscientious scruples that would or might prevent them from following the court-declared law of self-defense"); *People v. Taylor*, supra, 59 ("a trial court may not restrict voir dire in a manner that prevents the development of a factual basis for the exercise of peremptory challenges"); *State v. Brown*, supra, 799 ("a defendant has the right to discover whether prospective jurors have fixed opinions against applying the court-declared law of self-defense").

Although the defendant observes correctly that self-defense was a critically important issue in the present case, we conclude that the trial court properly required his counsel to question prospective jurors in more general terms about the permissibility of taking the life of another, rather than permitting counsel to ask questions targeted to self-defense specifically. Indeed, the answers of the selected jurors reveal that the trial court's ruling struck the proper balance between permitting the defendant to consider prospective jurors' prejudices, while not delving specifically into the facts of the present case, as no juror who responded negatively to the question about whether it is permissible to take a life was selected for service.[15] Accordingly, we conclude that the trial court did not abuse its discretion by restricting appropriately the defendant's voir dire questions.

## II

The defendant next claims that Judge Mullarkey improperly failed to give a jailhouse informant credibility instruction pursuant to *State* v. *Patterson*, supra, 276 Conn. 452, with respect to Moore's testimony. Specifically, the defendant claims that the trial court's failure to give a *Patterson* instruction constituted plain error requiring reversal because Moore's testimony was critical to the state's case and she had agreed to testify only after the prosecutor had promised to try to get her released on bond from her incarceration on charges of violation of probation. In response, the state argues

[15] Thus, we disagree further with the defendant's reliance on *State* v. *Lee*, 30 Conn. App. 470, 492, 620 A.2d 1303 (1993), aff'd, 229 Conn. 60, 640 A.2d 553 (1994), wherein the Appellate Court concluded that the trial court had abused its discretion by precluding the defendant from questioning prospective jurors on the defense of entrapment, because that defense was "the heart of this case." *Lee* is distinguishable because that case did not present an alternate line of questioning that would have, in an effective manner, uncovered the prejudices of the prospective jurors.

that this unpreserved claim does not warrant plain error reversal because the lack of a *Patterson* instruction did not undermine the fairness and integrity of the proceedings. The state also contends that the defendant was not entitled to a *Patterson* instruction because, although Moore was a witness who had been incarcerated, she nevertheless was not a jailhouse informant because she did not testify regarding an incriminating statement made by the defendant while they were imprisoned together. Finally, the state claims that, even if the failure to give a *Patterson* instruction was improper, it was rendered harmless by Moore's testimony about her interactions with the prosecutor, the trial court's general credibility instructions, and other witnesses' even more damaging testimony. We agree with the state that the trial court's failure to give a *Patterson* instruction in the present case was not plain error.

The record reveals the following additional relevant facts and procedural history. At the conclusion of his direct examination of Moore, who had accompanied the victim at the time of his altercation with the defendant, the prosecutor questioned Moore about her criminal history. She testified that she was incarcerated at the time of trial, following an arrest for violation of probation, with two pending cases for criminal trespass and possession of marijuana with intent to sell. Moore testified that the prosecutor in the present case had told her that he would "do [his] best" to have her released on bond. Moore then testified that no other promises had been made to her with respect to her testimony in the present case. The defendant did not cross-examine Moore on this topic.

In *State* v. *Patterson,* supra, 276 Conn. 465, the defendant's cell mate from his pretrial detention testified concerning confidential incriminating conversations that he had engaged in with the defendant. The cell mate had agreed to testify only after receiving benefits

in return for his cooperation, including a two year reduction in the sentence he was serving for robbery, "a favorable recommendation with respect to the disposition of his pending narcotics charges, assistance in obtaining early parole, a transfer to another prison and restoration of his visitation privileges." Id. On appeal, we stated that there are two exceptions to the general rule that "a [criminal] defendant is not entitled to an instruction singling out any of the state's witnesses and highlighting his or her possible motive for testifying falsely . . . [namely] the complaining witness exception and the accomplice exception." (Citations omitted; internal quotation marks omitted.) Id., 467. We then observed that "an informant who has been promised a benefit by the state in return for his or her testimony has a powerful incentive, fueled by self-interest, to implicate falsely the accused. Consequently, the testimony of such an informant, like that of an accomplice, is inevitably suspect." Id., 469. Accordingly, we adopted a third exception to the general rule and concluded that the defendant should have received, upon his request, a cautionary instruction about the credibility of a jailhouse informant "[b]ecause the testimony of an informant who expects to receive a benefit from the state in exchange for his or her cooperation is no less suspect than the testimony of an accomplice who expects leniency from the state . . . ."[16] Id., 470; see also *State*

---

[16] Noting that the failure to give the special credibility instruction was a nonconstitutional error, we applied a four factor test to determine "whether the trial court's failure to give the requested instruction was harmful. These considerations include: (1) the extent to which [the jailhouse informant's] apparent motive for falsifying his testimony was brought to the attention of the jury, by cross-examination or otherwise; (2) the nature of the court's instructions on witness credibility; (3) whether [the jailhouse informant's] testimony was corroborated by substantial independent evidence; and (4) the relative importance of [the jailhouse informant's] testimony to the state's case." *State* v. *Patterson*, supra, 276 Conn. 472. We then applied the four factors and concluded that, on the record in *Patterson*, the trial court's failure to give the instruction constituted harmful error. Id., 472–73.

v. *Arroyo*, 292 Conn. 558, 569, 973 A.2d 1254 (2009) (extending *Patterson* instruction to testimony of all jailhouse informants, even without "express promise of a benefit" from government).

Because a *Patterson* instruction is not a rule of constitutional dimension; see *State* v. *Patterson*, supra, 276 Conn. 471; and because the defendant failed to preserve this claim for appeal, he contends that the trial court's failure to give a *Patterson* instruction with respect to Moore's testimony was plain error requiring reversal. The plain error doctrine, which is "codified at Practice Book § 60-5, is an extraordinary remedy used by appellate courts to rectify errors committed at trial that, although unpreserved, are of such monumental proportion that they threaten to erode our system of justice and work a serious and manifest injustice on the aggrieved party. [T]he plain error doctrine . . . is not . . . a rule of reviewability. It is a rule of reversibility. That is, it is a doctrine that this court invokes in order to rectify a trial court ruling that, although either not properly preserved or never raised at all in the trial court, nonetheless requires reversal of the trial court's judgment, for reasons of policy. . . . In addition, the plain error doctrine is reserved for truly extraordinary situations [in which] the existence of the error is so obvious that it affects the fairness and integrity of and public confidence in the judicial proceedings. . . . Plain error is a doctrine that should be invoked sparingly. . . . Implicit in this very demanding standard is the notion . . . that invocation of the plain error doctrine is reserved for occasions requiring the reversal of the judgment under review. . . . [Thus, an appellant] cannot prevail under [the plain error doctrine] . . . unless he demonstrates that the claimed error is both so clear and so harmful that a failure to reverse the judgment would result in manifest injustice." (Citations omitted;

internal quotation marks omitted.) *State* v. *Myers*, 290
Conn. 278, 289, 963 A.2d 11 (2009).

We conclude that the trial court's failure to give a
*Patterson* instruction was not plain error. Specifically,
we note that the Appellate Court recently has held that
"the trial court's failure to give, sua sponte, a jailhouse
informant instruction does not present the type of
extraordinary situation that warrants plain error
review"; *State* v. *Joseph*, 110 Conn. App. 454, 463, 955
A.2d 124, cert. denied, 289 Conn. 945, 959 A.2d 1010
(2008); particularly when the court has instructed the
jury generally on the credibility of witnesses. See id.;
see also *State* v. *Damato*, 105 Conn. App. 335, 351–52,
937 A.2d 1232, cert. denied, 286 Conn. 920, 949 A.2d
481 (2008). Thus, we find significant that direct exami-
nation of Moore rendered the jury well aware of her
criminal history, as well as the prosecutor's offer to
attempt to help obtain release on bond.[17] Indeed, the
defendant commented on Moore's agenda in discussing
the inconsistencies between the various witnesses' tes-
timony during his closing argument to the jury, which
was followed shortly thereafter by instructions wherein
the trial court discussed the jury's role in determining
the witnesses' credibility generally, and directed the
jury to consider any personal interest or bias a witness
might have with respect to his or her testimony in the

---

[17] We acknowledge, but need not address, the state's argument that the
applicability of *Patterson* in this case remains an open question because
Moore was not necessarily a jailhouse informant, as contemplated by the
*Patterson* line of cases because, although she was incarcerated when she
spoke to the prosecutor in the present case, she testified concerning events
that she had witnessed, rather than about comments or confidences that
the defendant had made to her while they were incarcerated together. See
*State* v. *Myers*, supra, 290 Conn. 287 (error is " 'plain' " or " 'obvious' " if
" 'not debatable' "); see also, e.g., *State* v. *Arroyo*, supra, 292 Conn. 564
(informant testified regarding comments defendant made while pair were
incarcerated); *State* v. *Slater*, 285 Conn. 162, 186–87, 939 A.2d 1105 (same),
cert. denied, 553 U.S. 1085, 128 S. Ct. 2885, 171 L. Ed. 2d 822 (2008); *State*
v. *Patterson*, supra, 276 Conn. 459–60 (same).

present case.[18] Thus, because the jury was aware of general credibility concerns with respect to Moore's testimony, as well as her history and the prosecutor's offer of assistance, we conclude that the trial court's failure to give, sua sponte, a more specific *Patterson* instruction was not plain error, the existence of which "is so obvious that it affects the fairness and integrity of and public confidence in the judicial proceedings."[19] (Internal quotation marks omitted.) *State* v. *Myers*, supra, 290 Conn. 289.

## III

We now turn to the defendant's various unpreserved claims with respect to the jury instructions in the present case, for which he seeks review pursuant to *State*

[18] The trial court instructed the jury, inter alia, that "you must decide which testimony to believe and which testimony not to believe. You may believe all, none, or any part of a witness' testimony. In making that decision, you may take into account a number of factors including the following: was the witness able to see or hear or know the things about which that witness testified; how well was the witness able to recall and describe those things; what was the witness' manner while testifying; *did the witness have any personal, financial, professional, or other interest in the outcome of this case or any bias or prejudice concerning any party or any matter involved in the case*; how reasonable was the witness' testimony considered in light of all the evidence in the case; and was the witness' testimony contradicted by what that witness had said or done at another time or contradicted by the testimony of other witnesses or by other evidence.

"You're entitled to observe the demeanor of the witnesses, to draw inferences therefrom, and to consider such evidence in assessing the credibility, if any, to be given to the witness' testimony. Your observations may include all genuine and spontaneous reactions of the witnesses in the courtroom to the extent that they bear on the witness' credibility." (Emphasis added.)

[19] With respect to the two other factors applied under a standard *Patterson* harmless error analysis, namely, "whether [the jailhouse informant's] testimony was corroborated by substantial independent evidence . . . and . . . the relative importance of [the jailhouse informant's] testimony to the state's case"; *State* v. *Patterson*, supra, 276 Conn. 472; we also note that Moore's testimony was not by itself the linchpin of the state's case because she did not identify the defendant as the shooter and much of her testimony about the altercation was corroborated by Ayala and Henry Rivera, another neighbor, as well as the defendant's confession to Margaret Clarke. See footnote 4 of this opinion and the accompanying text.

v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), and the plain error doctrine. See Practice Book § 60-5. Specifically, the defendant argues that the trial court improperly: (1) added an objective component into its charge on the retreat doctrine; (2) failed to integrate the retreat doctrine into its instruction on the defense of others; and (3) failed to instruct the jury, sua sponte, on the doctrine of defense of premises.

The record reveals the following additional relevant facts and procedural history with respect to the crafting of the jury instructions in the present case. The defendant did not file any requests to charge, but participated in discussions during the trial with the prosecutor and Judge Mullarkey regarding the content of the instructions that the trial court had proposed.[20] The only

[20] The trial court noted that "the only thing that's new, really new, is the self-defense. There's some other things I mentioned. There's some updates that the committee made on gender neutral language . . . and we had to vote on whether to say he or she or they. . . . Because we're trying to make the instruction both liberal, consistent, and have updated a few things.

"Now, in a case like this, of course, proximate cause is one of the instructions, but we have a shorter version because the long version of proximate cause is almost a, similarly, in here while it's a matter the state has to prove, there's not a lot of extenuating or intervening circumstances so far in the evidence.

"And we have . . . updated examples on the circumstantial evidence, although it's one that I've been using for a long time.

"So if you're going to have any written submissions, and I don't really require them to be written, I'd like to get them sometime Tuesday morning.

"What? Well, Wednesday at the latest unless you're going to go longer than I think.

"[Defense Counsel]: I don't anticipate going beyond Wednesday, Your Honor.

"The only other thing, I've gone over the one that you had recommended. What it doesn't include, though, is defense of others, and that would be involved in this case also.

"The Court: Well, the *Thompson* case [*State* v. *Thompson*, 266 Conn. 440, 832 A.2d 626 (2003)] did not involve that issue.

"[Defense Counsel]: Right.

"The Court: 'Cause of the circumstances of the—it was just two young men out on the street corner [in the] middle of the night apparently disputing over who controlled the street corner.

"[Defense Counsel]: I understand that there was also intoxication involved. And the only intoxication over here would be [the] intoxication of the victim, not of anyone else involved.

request that the defendant made at that time, beyond the court's proposed charge, was for an instruction on defense of others.

Thereafter, prior to closing arguments, the trial court summarized on the record the discussions between the parties and the court about the jury instruction that it intended to deliver, including charges on self-defense, defense of others and lesser included offenses.[21] At that time, the defendant responded in the negative when

"The Court: Oh, no. Yeah, there's going to be—sure there's going to be obvious factual differences, but the subjective, objective, the jury making certain findings that the court used to impose upon them is the real difference in there. But sure the individual factual differences we're going to have to iron out, yeah.

"[Defense Counsel]: I did—I believe it was the *Singleton* case [*State* v. *Singleton*, 97 Conn. App. 679, 905 A.2d 725 (2006), aff'd, 292 Conn. 734, 974 A.2d 679 (2009)] that was also involved over there with, where there's a factual finding in regard to the deadly force.

"The Court: Right. I know. But, you know—and we do that, even though in the *Thompson* case the young man was shot twice, once through the back of the heart. I mean, we tell them they have to decide whether deadly force was used, and yet it doesn't seem to be highly disputed in that case, *Thompson*, you know. And still, it's something the state has to prove, but it's not, not exactly a mystery."

[21] The trial court later stated that, the previous week, "the court officer handed out the self-defense instruction that had been used in a similar case called [*State* v. *Thompson*, 266 Conn. 440, 832 A.2d 626 (2003)]," and that defense counsel had "indicated he wanted defense of others. And unlike that other case, there was no intoxication issue here." The court stated that it and the parties had "went through the entire draft charge about one hour in the afternoon," and that defense counsel had "indicated he wanted the instruction on [the] defendant's choice not to testify.

"The state wanted the lesser includeds, which essentially are manslaughter [§ 53a-55a] (a) (1) and (a) (3), and instruction on the prior record of Henry Rivera. [The] state did not want conscious, did not request consciousness of guilt. [Defense counsel] did not want any, any lesser charges, certainly not further ones.

"We discussed and I believe agreed upon it was the jury's decision using [the] logic of [*State* v. *Singleton*, 97 Conn. App. 679, 905 A.2d 725 (2006), aff'd, 292 Conn. 734, 974 A.2d 679 (2009)] to decide where the shooter was, vis-á-vis in the apartment or not in the apartment.

"Yesterday we had a complete draft, and we went through it in the morning and then again in the afternoon.

"[Defense counsel] wanted combat by agreement out. [The prosecutor] felt it was not an issue in the case. We reworded some things on the lesser included.

the court asked whether the parties had any "additions or subtractions" or corrections to the proposed charge. After the trial court charged the jury following summations, both the defendant and the state confirmed that they had no exceptions to the instruction as given, the relevant specifics of which will be discussed in parts III A 2 and 3 of this opinion.

## A

## 1

At the outset, we consider the reviewability of the defendant's instructional claims with respect to the retreat doctrine. The defendant acknowledges that he failed to preserve these claims by filing a written request to charge or taking an exception to the instruction as given, but seeks review pursuant to *State* v. *Golding*, supra, 213 Conn. 239–40, under which we review claims not preserved at trial only if: "(1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant

---

"[The prosecutor] requested a *Whelan* charge [*State* v. *Whelan*, 200 Conn. 743, 513 A.2d 86, cert. denied, 479 U.S. 994, 107 S. Ct. 597, 93 L. Ed. 2d 598 (1986)] on . . . essentially an excerpt of exhibit fifty-one? And my note of exhibit fifty-one, that excerpt was not put in because it contained in its original the prohibited nickname of the defendant.

"And this morning I informed counsel I only found three changes last night. One was the spelling change of . . . Margaret . . . Clarke's last name. The other was [the] prior conviction of a witness, to flesh that out as we had agreed to on . . . Rivera's conviction. I believe that was 2006.

"[The Prosecutor]: Right. It was about seven months ago.

"The Court: Yeah. I didn't have all that—

"[The Prosecutor]: Or six months ago.

"The Court: In front of me.

"And the only other thing I wanted added was to remind the jury if they got to [§ 53a-55a] (a) (3) on manslaughter, that it is a general intent offense.

"There's only three changes to what—and they're minor.

"Any additions or subtractions, corrections?

"[Defense Counsel]: No, Your Honor."

of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt. In the absence of any one of these conditions, the defendant's claim will fail. The appellate tribunal is free, therefore, to respond to the defendant's claim by focusing on whichever condition is most relevant in the particular circumstances." The state does not dispute that the first two prongs of the defendant's *Golding* analysis with respect to the retreat claims have been met, namely, both that the record is adequate for review and that an improper charge on the elements of self-defense implicates the defendant's due process rights and is, therefore, a claim of constitutional magnitude. See, e.g., *State* v. *Fabricatore*, 281 Conn. 469, 477, 915 A.2d 872 (2007); *State* v. *Whitford*, 260 Conn. 610, 621, 799 A.2d 1034 (2002). Rather, the state relies on the line of cases exemplified by *State* v. *Fabricatore*, supra, 469, and contends that the defendant cannot prevail under the third prong of *Golding* because he waived his claim on appeal by expressing his satisfaction with the challenged instruction at trial. We conclude that this claim is reviewable because the defendant, while acquiescing to the charge as given at trial, did not actively induce the trial court to act on the challenged portion of the instruction.

In *State* v. *Fabricatore*, supra, 281 Conn. 481–82, we concluded that a defendant who had sought review of his claim that the trial court improperly had charged the jury about the retreat doctrine could not prevail under the third prong of *Golding*. In so concluding, we noted that "defense counsel not only failed to object to the instruction as given or to the state's original request to charge the jury with the duty to retreat, but clearly expressed his satisfaction with that instruction, and in fact *subsequently argued that the instruction as given was proper*. Indeed, defense counsel himself

addressed the duty to retreat in his own summation. Thus, the defendant accepted the duty to retreat theory presented by the prosecutor, and openly acquiesced at trial, thereby waiving his right to challenge the instruction on appeal. Under this factual situation, we simply cannot conclude that injustice [has been] done to either party . . . or that the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial . . . ." (Citation omitted; emphasis added; internal quotation marks omitted.) Id. Citing cases wherein the defendant had supplied and advocated at trial for the instructional language that he subsequently challenged on appeal, we emphasized that our conclusion that "unpreserved, waived claims, fail under the third prong of *Golding*, is consistent with our decisions declining to review claims of induced error . . . [under *Golding*] because [t]o allow [a] defendant to seek reversal now that his trial strategy has failed would amount to allowing him to induce potentially harmful error, and then ambush the state [and the trial court] with that claim on appeal." (Citation omitted; internal quotation marks omitted.) Id., 482; accord *State* v. *Holness*, 289 Conn. 535, 542–43, 958 A.2d 754 (2008) (*Golding* review unavailable when "defense counsel clearly and unequivocally agreed to the limiting instruction that the trial court gave to the jury concerning the statements that the [prosecutor] had attributed to [an unavailable declarant] during cross-examination of the defendant"); *State* v. *Brewer*, 283 Conn. 352, 360–61, 927 A.2d 825 (2007) (defendant could not prevail under third prong of *Golding* when he affirmatively requested exact lesser included offense instruction challenged on appeal and expressed satisfaction with that charge).

We conclude that the present case is distinguishable from *Fabricatore* and *Brewer* because, although the defendant acquiesced in the charge that the trial court ultimately gave to the jury, he did not supply, or other-

wise advocate for, the retreat doctrine language at issue in this appeal. Put differently, there is no indication that the defendant actively induced the trial court to give the retreat instruction that he now challenges on appeal, which renders this claim reviewable under *Golding*. See *State* v. *Madigosky*, 291 Conn. 28, 35 n.7, 966 A.2d 730 (2009) (acquiescence at trial to jury instruction challenged on appeal, without more, does not constitute induced error that would preclude review under *Golding*). Accordingly, our recent decision in *Madigosky* requires us to disagree with the state's argument that the defendant waived his right to *Golding* review of his instructional claim as it pertains to the retreat doctrine.[22]

2

Accordingly, we now turn to the defendant's claim that, in charging the jury, the trial court improperly imposed an objective component on the otherwise subjective retreat doctrine, which, according to the defendant, was harmful because "the present case hinged substantially on whether the defendant failed to retreat

---

[22] We note that our conclusion, which harmonizes *Fabricatore* and *Madigosky*, represents a departure from certain recent Appellate Court decisions applying *Fabricatore*, including *State* v. *Akande*, 111 Conn. App. 596, 608–609, 960 A.2d 1045 (2008), cert. granted, 290 Conn. 918, 919, 966 A.2d 237 (2009) ("[d]id the Appellate Court properly determine that the defendant waived his claim that the jury instructions were constitutionally deficient"), wherein the Appellate Court "decline[d] to draw a distinction between defense counsel stating that he had no problem with a jury charge that he specifically requested and defense counsel stating that he had no problem with a jury charge that he had not specifically requested. There is also no difference between counsel stating that he has no comment about the charge and counsel stating that the charge as read was correct." *State* v. *Akande*, supra, 608–609; see also *State* v. *Velez*, 113 Conn. App. 347, 357–59, 966 A.2d 743 (failure to except to trial court's response to jury question about proof of intent constituted waiver under *Fabricatore*), cert. denied, 291 Conn. 917, 970 A.2d 729 (2009); *State* v. *Farmer*, 108 Conn. App. 82, 88, 946 A.2d 1262 (failure to file request to charge or except to constancy of accusation instruction constituted waiver under *Fabricatore*), cert. denied, 288 Conn. 914, 954 A.2d 185 (2008).

within the meaning of the self-defense statute . . . ." In response, the state contends that a review of the overall charge makes clear that the jury here was repeatedly apprised "of the subjective nature of the retreat doctrine." The state also contends that any impropriety was harmless error because retreat was not a significant issue at trial. We agree with the state and conclude that the challenged instructions were an appropriate statement of the subjective nature of the retreat doctrine.

We note briefly that, after explaining the general principles governing self-defense, namely, the subjective-objective test requiring that the state disprove, beyond a reasonable doubt, that the defendant subjectively held an objectively reasonable belief that the use of deadly force was necessary to defend himself or others; see, e.g., General Statutes § 53a-19 (a);[23] the trial court then

[23] General Statutes § 53a-19 (a) provides: "Except as provided in subsections (b) and (c) of this section, a person is justified in using reasonable physical force upon another person to defend himself or a third person from what he reasonably believes to be the use or imminent use of physical force, and he may use such degree of force which he reasonably believes to be necessary for such purpose; except that deadly physical force may not be used unless the actor reasonably believes that such other person is (1) using or about to use deadly physical force, or (2) inflicting or about to inflict great bodily harm."

We have explained that "[t]he subjective-objective inquiry into the defendant's belief regarding the necessary degree of force requires that the jury make two separate affirmative determinations in order for the defendant's claim of self-defense to succeed. First, the jury must determine whether, on the basis of all of the evidence presented, the defendant in fact had believed that he had needed to use deadly physical force, as opposed to some lesser degree of force, in order to repel the victim's alleged attack. . . . The jury's initial determination, therefore, requires the jury to assess the veracity of witnesses, often including the defendant, and to determine whether the defendant's account of his belief in the necessity to use deadly force at the time of the confrontation is in fact credible. . . .

"If the jury determines that the defendant [did] not [believe] that he . . . needed to employ deadly physical force to repel the victim's attack, the jury's inquiry ends, and the defendant's self-defense claim must fail. If, however, the jury determines that the defendant in fact had believed that the use of deadly force was necessary, the jury must make a further determi-

instructed the jury: "The state can also disprove the claim of self-defense through the exception to the self-defense of retreat. Our law provides that a person is not justified in using deadly physical force upon another person if he knows that he can avoid the necessity of using such force with complete safety by retreating. The statute requires both that the retreat was completely safe and available and that the defendant knew of it. Complete safety without any injury whatsoever to him or other people.

"Self-defense focuses on the person claiming self-defense. *It focuses on what he reasonably believed under the circumstances* and presents a question of fact as to whether a safe retreat was available and whether the defendant subjectively knew of it. Retreat is only required where the defendant . . . himself knows that he can avoid the necessity of using deadly physical force with complete safety, did the defendant subjectively know he could retreat with complete safety.

"If you find . . . [that] the state has proven beyond a reasonable doubt that a safe retreat was available and that the defendant knew of it, and you find so unanimously beyond a reasonable doubt, you should reject the self-defense claim. The law stresses that self-defense cannot be retaliatory. It must be defensive and not punitive. So you must ask yourself did the defendant know that he could avoid the use of deadly physical force by retreating safely? If so, and yet he chose to

nation as to whether that belief was reasonable, from the perspective of a reasonable person in the defendant's circumstances. . . . Thus, if a jury determines that the defendant's honest belief that he had needed to use deadly force, instead of some lesser degree of force, was not a reasonable belief, the defendant is not entitled to the protection of § 53a-19." (Internal quotation marks omitted.) *State* v. *Saunders*, 267 Conn. 363, 373–74, 838 A.2d 186, cert. denied, 541 U.S. 1036, 124 S. Ct. 2113, 158 L. Ed. 2d 722 (2004).

pursue the use of deadly physical force, you should reject the self-defense claim."[24] (Emphasis added.)

"[A] fundamental element of due process of law is the right of a defendant charged with a crime to establish a defense. . . . We previously have held that [t]his fundamental constitutional right includes proper jury instructions on the elements of self-defense so that the jury may ascertain whether the state has met its burden of proving beyond a reasonable doubt that the assault was not justified. . . .

"Where, as here, the challenged jury instructions involve a constitutional right, the applicable standard of review is whether there is a reasonable possibility that the jury was misled in reaching its verdict. . . . In evaluating the particular charges at issue, we must adhere to the well settled rule that a charge to the jury is to be considered in its entirety, read as a whole, and judged by its total effect rather than by its individual component parts. . . . [T]he test of a court's charge is . . . whether it fairly presents the case to the jury in such a way that injustice is not done to either party under the established rules of law. . . . As long as [the instructions] are correct in law, adapted to the issues and sufficient for the guidance of the jury . . . we will not view [them] as improper." (Citations omitted; internal quotation marks omitted.) *State* v. *Whitford*, supra, 260 Conn. 617–20; see also *State* v. *Ash*, 231 Conn. 484, 493–94, 651 A.2d 247 (1994) ("[a] charge to the jury is not to be critically dissected for the purpose of discovering possible inaccuracies of statement, but it is to be considered rather as to its probable effect upon the jury in

[24] The trial court also instructed the jury on the exception to the retreat doctrine applicable when the defendant is in his dwelling and is not the initial aggressor, and further explained that the jury would need to determine where the shooting occurred because, in the context of multifamily buildings, this exception would apply only to the defendant's apartment itself, and not to a common hallway.

guiding them to a correct verdict in the case" [internal quotation marks omitted]).

The retreat doctrine is codified at General Statutes (Rev. to 2003) § 53a-19 (b),[25] which provides in relevant part that "a person is not justified in using deadly physical force upon another person if he knows that he can avoid the necessity of using such force with complete safety (1) by retreating, except that the actor shall not be required to retreat if he is in his dwelling, as defined in section 53a-100 . . . ." Unlike the self-defense principles set forth in subsection (a) of § 53a-19, which impose a subjective-objective test; see footnote 23 of this opinion; the duty to retreat set forth in subsection (b) "imposes only a subjective requirement . . . [and] *requires both that a retreat in complete safety be available and that the defendant know of it.* The self-defense statute . . . § 53a-19 . . . focuses on the person . . . claiming self-defense. It focuses on what *he* reasonably believes under the circumstances and presents a question of fact [as to whether a safe retreat was available and whether he knew of it]. . . . This statutory emphasis upon the defendant further demonstrates the function of the jury in their evaluation of the self-defense

[25] General Statutes (Rev. to 2003) § 53a-19 (b) provides: "Notwithstanding the provisions of subsection (a) of this section, a person is not justified in using deadly physical force upon another person if he knows that he can avoid the necessity of using such force with complete safety (1) by retreating, except that the actor shall not be required to retreat if he is in his dwelling, as defined in section 53a-100, or place of work and was not the initial aggressor, or if he is a peace officer or a private person assisting such peace officer at his direction, and acting pursuant to section 53a-22, or (2) by surrendering possession of property to a person asserting a claim of right thereto, or (3) by complying with a demand that he abstain from performing an act which he is not obliged to perform."

We note that § 53a-19 (b) was amended by No. 05-180, § 1, of the 2005 Public Acts, to include special policemen, and by No. 08-150, § 49, of the 2008 Public Acts, to include inspectors from the department of motor vehicles, within the peace officer exception to the retreat doctrine. Hereinafter, all references to § 53a-19 (b) are to the 2003 revision unless otherwise noted.

claim. . . . [Section] 53a-19 (b) requires recourse to retreat in lieu of the use of physical force *only when the actor himself knows* that he can avoid the necessity of using such force with complete safety . . . ." (Citations omitted; emphasis altered; internal quotation marks omitted.) *State* v. *Ash*, supra, 231 Conn. 492; see also, e.g., *State* v. *Saunders*, 267 Conn. 363, 374, 838 A.2d 186 ("a defendant who raises a claim of self-defense is required to retreat in lieu of using deadly physical force if the state establishes beyond a reasonable doubt that a completely safe retreat was available and that the defendant actually was aware of it"), cert. denied, 541 U.S. 1036, 124 S. Ct. 2113, 158 L. Ed. 2d 722 (2004).

Even if we were to assume that the isolated language referring to what the defendant " 'reasonably believes under the circumstances' " is legally incorrect, despite the fact that it comes verbatim from two decisions by this court; see *State* v. *Ash*, supra, 231 Conn. 492; *State* v. *Quintana*, 209 Conn. 34, 46, 547 A.2d 534 (1988);[26] and a widely recognized treatise on jury instructions in

---

[26] We note that the phrase, to "reasonably believe under the circumstances," first was utilized in the context of the retreat doctrine in *State* v. *Quintana*, supra, 209 Conn. 46, wherein the court stated specifically: " 'The self-defense statute . . . § 53a-19 . . . focuses on the person . . . claiming self-defense. It focuses on what *he* reasonably believes under the circumstances and presents a question of fact [as to whether a safe retreat was available and whether he knew of it]. . . . This statutory emphasis upon the defendant further demonstrates the function of the jury in their evaluation of the self-defense claim.' " (Emphasis in original.) We acknowledge that the original development of this proposition in *Quintana* may well have been misleading to the bench and bar, as this court quoted *State* v. *Corchado*, 188 Conn. 653, 663, 453 A.2d 427 (1982), for the general proposition of what the defendant "reasonably believes under the circumstances," and then added the bracketed language "[as to whether a safe retreat was available and whether he knew of it]." (Internal quotation marks omitted.) *State* v. *Quintana*, supra, 46. The quotation from *Corchado* may well have been inartful, because *Corchado* was not a retreat case under § 53a-19 (b) but, rather, focused on the inquiries under § 53a-19 (a) and (c), namely, whether the defendant therein was an initial aggressor, and reasonably believed that the use of deadly force was necessary. *State* v. *Corchado*, supra, 668–69.

Connecticut; J. Pellegrino, A Collection of Connecticut Selected Jury Instructions: Criminal (3d Ed. 2001) § 2.40, p. 115;[27] we conclude that the instructions as a whole did not mislead the jury regarding the subjective nature of the retreat doctrine. Indeed, the very sentence that the defendant complains of emphasizes the entirely subjective nature of the retreat inquiry by stating that it is "a question of fact as to whether a safe retreat was available and whether the defendant *subjectively* knew of it." (Emphasis added.) The subsequent sentence in that paragraph emphasizes further that "[r]etreat is only required where the *defendant . . . himself knows* that he can avoid the necessity of using deadly physical force with complete safety, did the *defendant subjectively know* he could retreat with complete safety." (Emphasis added.) Moreover, the objectionable language was preceded by a paragraph emphasizing that "a person is not justified in using deadly physical force upon another person if *he knows* that he can avoid the necessity of using such force with complete safety by retreating [and that] [t]he statute requires both that the retreat was completely safe and available *and that the defendant knew of it.*" (Emphasis added.) Finally, a subsequent paragraph made clear the state's responsibility to prove "beyond a reasonable doubt that a safe retreat was available and the defendant knew of it," and implored the jurors to ask themselves: "[D]id the defendant know that he could avoid the use of deadly physical force by retreating safely?" Thus, we conclude that the jury instruction on the duty to retreat properly reflected the subjective nature of that inquiry.[28]

[27] See, e.g., *State* v. *Sanchez*, 84 Conn. App. 583, 592 n.10, 854 A.2d 778 ("[w]hile not dispositive of the adequacy of the [jury] instruction, an instruction's uniformity with the model instructions is a relevant and persuasive factor in our analysis"), cert. denied, 271 Conn. 929, 859 A.2d 585 (2004).

[28] We also agree with the state that any potential impropriety in the charge was harmless beyond a reasonable doubt under the fourth prong of *Golding* because retreat was not a significant factual issue in the present case, as neither the state nor the defendant argued about that facet of the defendant's self-defense claim during their summations, focusing instead on the reason-

3

The defendant next claims that the trial court improperly failed to instruct the jury that, "if a third person [that the defendant] was defending was not required to retreat, or could not retreat in complete safety, then [the defendant] was not required to retreat before using deadly force to protect that person." The defendant emphasizes that, under § 53a-19 (a), since he steps into the shoes of the persons whom he was defending, namely, Lawanne and Destiny, who were inside the apartment at the time of the shooting, the defendant also had no duty to retreat under § 53a-19 (b). In response, the state contends that the defendant's claim is unsupported by the plain language of § 53a-19 (b), which makes no reference to third persons, and that

---

ableness of the defendant's subjective belief that the use of deadly force was necessary, particularly when viewed in light of the defendant's statement to Margaret Clarke that he had shot the victim because the victim had disrespected Lawanne. Compare, e.g., *State* v. *Ash*, supra, 231 Conn. 498–99 (reversal required after improper retreat doctrine instruction because, after considering evidence presented at trial and "the state's protracted treatment of the issue during its closing argument," "the state's case here hinged substantially on whether the defendant, at some point either prior to or during the fatal altercation, failed to retreat within the meaning of the self-defense statute"), with *State* v. *Quintana*, supra, 209 Conn. 47–48 (improper retreat instruction was harmless error when "the evidence presented to the jury can fairly be said to center on the credibility of [former girlfriend's] self-defense version of the stabbing, measured against the credibility of [testimony of victim's friend] . . . that an attempted robbery was the motivating force behind the stabbing"), and *State* v. *Scarpiello*, 40 Conn. App. 189, 212, 670 A.2d 856 (Jury instruction that failed to address subjective component of retreat was harmless error under fourth prong of *Golding* because "the issue of retreat was not presented to the jury as a significant factor to consider in the resolution of the defendant's self-defense claim. The jury was presented with two conflicting versions of the shooting, neither of which implicated the duty to retreat."), cert. denied, 236 Conn. 921, 674 A.2d 1327 (1996); cf. *State* v. *Lemoine*, 256 Conn. 193, 200, 770 A.2d 491 (2001) ("[b]ecause the state made no claim that the defendant should have retreated . . . the defendant did not suffer constitutional harm by the trial court's omission of an unnecessary and potentially confusing instruction on the duty to retreat").

any impropriety was harmless because retreat was not an issue in this case.

Although case law suggests, and the defendant contends, that his duty to retreat with respect to defense of third persons requires consideration of the retreat duty of those third persons; see *State* v. *Silveira*, 198 Conn. 454, 470 n.6, 503 A.2d 599 (1986) ("[a]n interpretation of [§ 53a-19 (b)] requiring a defendant acting in defense of another to retreat, without regard to the ability to retreat of the person defended, would be inconsistent with the general right to defense of others set forth in subsection [a]"); *State* v. *Rodriguez*, 47 Conn. App. 91, 96, 702 A.2d 906 (1997) ("[t]he court's instructions make it clear that a necessary predicate to the defendant's claim that he, as . . . defender [of a third person], did not have a duty to retreat, is that [the third person] himself did not have a duty to retreat"), cert. denied, 243 Conn. 960, 705 A.2d 552 (1998); we conclude that any omission on this topic was harmless error not requiring reversal under the fourth prong of *Golding*. As discussed previously; see footnote 28 of this opinion; the critical factual issue in the present case focused on the reasonableness of the defendant's perception of a threat from the victim or, rather, whether the defendant was motivated to shoot the victim for disrespecting Lawanne. Retreat was not a significant factual issue in this case, and any instructional omission thereon did not operate to mislead the jury. See *State* v. *Lemoine*, 256 Conn. 193, 200, 770 A.2d 491 (2001) ("[b]ecause the state made no claim that the defendant should have retreated . . . the defendant did not suffer constitutional harm by the trial court's omission of an unnecessary and potentially confusing instruction on the duty to retreat"); see also *State* v. *Quintana*, supra, 209 Conn. 47–48; *State* v. *Scarpiello*, 40 Conn. App. 189, 212, 670 A.2d 856, cert. denied, 236 Conn. 921, 674 A.2d 1327 (1996).

B

Finally, we address the defendant's claim that the trial court improperly failed to instruct the jury on defense of premises pursuant to General Statutes § 53a-20.[29] Although the defendant failed to request this charge at trial, he raises this claim pursuant to *State* v. *Golding*, supra, 213 Conn. 239–40, and contends that the trial court had a duty to instruct the jury, sua sponte, on defense of premises because the victim was a trespasser who had entered the building to commit a crime of violence. Citing, inter alia, *State* v. *Preyer*, 198 Conn. 190, 199, 502 A.2d 858 (1985), the defendant argues further that his failure to request the defense of premises charge at trial does not preclude review of this claim under *Golding* because self-defense claims are justification defenses, which relate to the elements of the offense that the state must prove, rather than affirmative defenses for which the defendant bears the burden of proof. In response, the state contends again that the defendant waived review of this claim under *Golding* by assenting to the instructions given at trial, and relies on a line of Appellate Court cases following *Preyer*, holding that the trial court does not have a duty to charge the jury on defenses in the absence of a request to charge, regardless of the nature of that defense. We agree with the state and conclude that trial

[29] General Statutes § 53a-20 provides: "A person in possession or control of premises, or a person who is licensed or privileged to be in or upon such premises, is justified in using reasonable physical force upon another person when and to the extent that he reasonably believes such to be necessary to prevent or terminate the commission or attempted commission of a criminal trespass by such other person in or upon such premises; but he may use deadly physical force under such circumstances only (1) in defense of a person as prescribed in section 53a-19, or (2) when he reasonably believes such to be necessary to prevent an attempt by the trespasser to commit arson or any crime of violence, or (3) to the extent that he reasonably believes such to be necessary to prevent or terminate an unlawful entry by force into his dwelling as defined in section 53a-100, or place of work, and for the sole purpose of such prevention or termination."

courts do not have a duty to charge the jury, sua sponte, on defenses, affirmative or nonaffirmative in nature, that are not requested by the defendant.

We begin with a review of *State* v. *Preyer*, supra, 198 Conn. 195–96, a sexual assault and kidnapping case in which the defendant claimed, and the state conceded, that the trial court improperly had charged the affirmative defense of cohabitation out of the case. The defendant had not, however, filed a proper request to charge or taken an exception to the charge as given. Id., 196. Although this court concluded that the trial court "committed plain error by misstating the effect of the governing statutes . . . [thereby] expressly and incorrectly preclud[ing] any jury consideration of this affirmative defense"; id., 198; this court also rejected the defendant's "more sweeping claim . . . that a trial court always has an independent obligation, as a matter of law, to charge on any theory of defense for which there is a foundation in the evidence." Id., 196. This court stated that "[t]here is no basis, in the law of this state, for the defendant's broad claim that a trial court has an independent obligation to instruct the jury on the affirmative defense of cohabitation if the evidence at trial would suffice to support such a charge. In the absence of a timely request or exception, failure to charge on an affirmative defense is reviewable as an exceptional circumstance within the doctrine of *State* v. *Evans*, 165 Conn. 61, 70, 327 A.2d 576 (1973), only when the defendant can demonstrate that he 'has clearly been deprived of a fundamental constitutional right and a fair trial,' or under Practice Book § [60-5] as plain error. While the constitutional law of due process is implicated by a trial court's failure to instruct the jury on the essential elements of the offense on which the conviction rests . . . we have in the past found no constitutional infirmity in failure to charge on such defenses as entrapment . . . extreme emotional dis-

turbance . . . or alibi. . . . Nothing in the circumstances of this case suggests that a different rule should obtain for the defense of cohabitation." (Citations omitted.) *State* v. *Preyer*, supra, 196–97.

This court further rejected the defendant's contention that *Washington* v. *Texas*, 388 U.S. 14, 87 S. Ct. 1920, 18 L. Ed. 2d 1019 (1967), "establish[ed] an unqualified constitutional right to correct jury instructions on any defense the defendant may have"; *State* v. *Preyer*, supra, 198 Conn. 197 n.9; and rejected as distinguishable his reliance on "a number of cases from other jurisdictions in which the failure of the trial court to instruct on a defense, even in the absence of a request, was held to have been erroneous." Id. We disagreed specifically with the California rule that "imposes on the trial court a duty to instruct, sua sponte, on general principles of law relevant to all issues raised in evidence, including 'defenses . . . and on the relationship of these defenses to the elements of the charged offense.' *People* v. *Sedeno*, 10 Cal. 3d 703, 716, 518 P.2d 913, 112 Cal. Rptr. 1 (1974)." *State* v. *Preyer*, supra, 198 n.9.

Our Appellate Court has relied on footnote 9 of *State* v. *Preyer*, supra, 198 Conn. 197 n.9, and has applied the holding of that case, beyond affirmative defenses, to justification defenses that the state retains the burden of disproving.[30] In *State* v. *Torrice*, 20 Conn. App. 75,

---

[30] The defendant's reliance on *State* v. *Ortiz*, 71 Conn. App. 865, 804 A.2d 937, cert. denied, 261 Conn. 942, 808 A.2d 1136 (2002), for the proposition that "[e]ven affirmative defenses are subject to [the] plain error rule if not given," is overly broad. In *Ortiz*, the Appellate Court concluded that it was plain error for the trial court not to instruct the jury about the affirmative defense of inoperability of a firearm with respect to robbery charges under General Statutes § 53a-134 (a), because there was uncontroverted evidence from the state's witnesses that the gun used was inoperable, and the affirmative defense at issue was written directly into the statute that the defendant was charged with violating. Id., 874 and n.3. Indeed, the Appellate Court emphasized that "there is no more than a facial similarity between this case and *State* v. *Preyer*, [supra, 198 Conn. 196]," because this court had "rejected the defendant's 'sweeping' claim 'that a trial court *always* has an independent obligation, as a matter of law, to charge on *any* theory of defense for

76–77, 82, 564 A.2d 330, cert. denied, 213 Conn. 809, 568 A.2d 794 (1989), wherein the defendant was convicted of, inter alia, assault in the third degree and risk of injury to a child, the defendant claimed that the jury instructions rendered it "reasonably possible that the jury was misled on essential elements of the crimes with which he was charged" because they did not instruct the jury about General Statutes § 53a-18 (1), which renders justifiable the use of "reasonable physical force" for, inter alia, the discipline of a child. If the jury had been so instructed, the state then would have borne the burden of disproving that defense beyond a reasonable doubt. Id., 82. The Appellate Court relied on *Preyer* and stated that, "[a]lthough it is generally true that a defendant is entitled to an appropriate defense instruction when it is warranted by the evidence . . . our Supreme Court has expressly stated that the trial court does not have a constitutional duty to instruct on a defense sua sponte. . . . The defendant's claim, therefore, is not of constitutional proportions and we decline to review it. Because the language of . . . § 53a-18 (1) does not impose a mandatory duty on the trial court to give such an instruction, we also decline to review the claim under the plain error doctrine." (Citations omitted.) Id., 83; see *State* v. *Solomon*, 103 Conn. App. 530, 532, 535–36, 930 A.2d 716 (2007) (trial court had no duty to instruct jury sua sponte about self-defense because defendant in assault case arising from domestic dispute failed to request instruction or "present evidence to warrant a jury instruction on the defense");

which there is a foundation in the evidence' . . . [and emphasized that its] conclusion of plain error is limited to instances such as the one at issue in which the affirmative defense is written into the statute, and the evidence proving that defense is uncontroverted and introduced by the opposing party." (Citation omitted; emphasis added.) *State* v. *Ortiz*, supra, 874 n.3; see also *State* v. *Martin*, 100 Conn. App. 742, 751 n.6, 919 A.2d 508 (emphasizing that holding in *Ortiz* is limited to situations wherein defense is written into statute and supported by uncontroverted evidence introduced by opposing party), cert. denied, 282 Conn. 928, 926 A.2d 667 (2007).

*State* v. *Williams*, 44 Conn. App. 231, 239–40, 689 A.2d 484 ("[g]enerally, trial courts do not have an obligation, sua sponte, to instruct on any theory of defense that the evidence might support," despite fact that "evidence may have suggested that a charge on intoxication may have been appropriate"), cert. denied, 240 Conn. 918, 692 A.2d 815 (1997); *State* v. *Peters*, 40 Conn. App. 805, 822 n.10, 673 A.2d 1158 ("[a]lthough we conclude that the trial court conveyed to the jury that the concept of self-defense applied to the charge of risk of injury, we note that if the trial court had not done so, it would not have been required to give such an instruction, sua sponte"), cert. denied, 237 Conn. 925, 677 A.2d 949 (1996); accord *State* v. *Crawley*, 93 Conn. App. 548, 565–69, 889 A.2d 930 (rejecting claim in narcotics possession case that trial court had obligation to instruct jury, sua sponte, about doctrine of nonexclusive possession), cert. denied, 277 Conn. 925, 895 A.2d 799 (2006).

We agree with this line of Appellate Court cases and conclude that the trial court did not have an obligation to charge the jury, sua sponte, on defense of premises pursuant to § 53a-20, despite the fact that the evidence in the present case might well have warranted this instruction, had the defendant requested it appropriately. Although justification defenses differ from affirmative defenses in that the state, and not the defendant, bears the burden of disproving a justification defense such as self-defense beyond a reasonable doubt, and are of constitutional dimension because they negate an element of the crime charged; see, e.g., General Statutes § 53a-12 (a); *State* v. *Lemoine*, supra, 256 Conn. 199; the assertion and proof of the justification defense nevertheless remains the defendant's responsibility in the first instance. See, e.g., *State* v. *Clark*, 264 Conn. 723, 730–31, 826 A.2d 128 (2003) ("[A] defendant has no burden of persuasion for a claim of self-defense; he has only a burden of production. That is, he merely is

required to introduce sufficient evidence to warrant presenting his claim of self-defense to the jury. . . . Once the defendant has done so, it becomes the state's burden to disprove the defense beyond a reasonable doubt." [Citations omitted.]). It would be inconsistent with this initial burden of production, as well as with the defendant's right to control the conduct of his own defense; see, e.g., *State* v. *Peeler*, 265 Conn. 460, 470, 828 A.2d 1216 (2003) (right to counsel of choice "stem[s] largely from an appreciation that a primary purpose of the sixth amendment is to grant a criminal defendant effective control over the conduct of his defense"), cert. denied, 541 U.S. 1029, 124 S. Ct. 2094, 158 L. Ed. 2d 710 (2004); to require the trial court to determine, without assistance from the parties, the defenses about which the jury should be instructed, particularly as "it is the responsibility of the parties to help the court in fashioning an appropriate charge. . . . The ever increasing refinement of our law justifies the cooperation of counsel in stating requests for jury instructions . . . ." (Citation omitted; internal quotation marks omitted.) *State* v. *Crawley*, supra, 93 Conn. App. 568–69; see also *State* v. *Arena*, 235 Conn. 67, 75–76, 663 A.2d 972 (1995) (stating same with respect to lesser included offenses). Accordingly, we conclude that the trial court did not have a duty to instruct the jury, sua sponte, about defense of premises pursuant to § 53a-20.

The judgment is affirmed.

In this opinion the other justices concurred.