******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT *v.*
THOMAS F. BONILLA
(SC 19056)

Rogers, C. J., and Palmer, Zarella, Eveleigh, McDonald, Espinosa and
Robinson, Js.

*Argued October 21, 2014—officially released August 18, 2015*

*Daniel J. Foster*, assigned counsel, for the appellant (defendant).

*Timothy F. Costello*, assistant state's attorney, with whom, on the brief, were *Maureen Platt*, state's attorney, and *Terence D. Mariani*, senior assistant state's attorney, for the appellee (state).

*Opinion*

ROBINSON, J. The defendant, Thomas F. Bonilla, appeals[1] from the judgment of conviction, rendered after a jury trial, of one count of murder as an accessory in violation of General Statutes §§ 53a-8 (a)[2] and 53a-54a (a),[3] and one count of felony murder in violation of General Statutes § 53a-54c.[4] On appeal, the defendant claims that: (1) the evidence was insufficient to support his conviction of murder as an accessory; and (2) the trial court improperly failed to instruct the jury, sua sponte, on the defense of duress, which is defined in General Statutes § 53a-14.[5] We disagree with both claims and, accordingly, affirm the judgment of the trial court.

The record reveals the following facts, which the jury reasonably could have found, and procedural history. On the evening of April 10, 1998, the defendant and his brothers, Noel Bermudez and Victor Santiago, were celebrating their reunion after a long period apart. The brothers' celebration initially entailed driving around Waterbury, drinking liquor, and snorting heroin. At some point during the evening, the defendant noticed that Bermudez was carrying a gun—which did not surprise him, because Bermudez always carried a gun.

Eventually, Santiago suggested that the brothers should rob Freddy Morales, the owner of a bar in Waterbury. In proposing this robbery to his brothers, Santiago explained that he had been stalking Morales, and believed that Morales would be carrying lots of money after closing up his bar that night. The defendant knew that Santiago had a long-standing grudge against Morales because, a few years prior, Morales had shot Santiago during a fight at that same bar. Santiago still bore scars from that shooting on his neck. Although the defendant expressed some reluctance, he ultimately went along with this plan "because of how [his] family rolls . . . ."

Santiago drove his brothers to the street where Morales lived. Bermudez and the defendant exited the car, and then waited nearby for Morales to return home from his bar. Approximately fifteen minutes later, they saw Morales. Bermudez sneaked up behind Morales on foot, while the defendant stayed back about "ten to fifteen feet . . . to look out in case something went wrong." Bermudez then demanded that Morales give up his money, pointed a gun at his chest, and shot him twice. After Bermudez grabbed a bank bag from the coat Morales was wearing, he and the defendant took off running to the getaway car, and Santiago drove them away. By the time emergency personnel responded to the scene of the shooting, Morales was dead.

Immediately after the shooting, the three brothers went to Santiago's house. Santiago's wife, Damaris Algarin-Santiago, came downstairs and saw the three

brothers sorting through a pile of cash and checks on her coffee table. Bermudez told Algarin-Santiago that he had shot Morales, which the defendant quickly followed upon by threatening Algarin-Santiago, stating, "if you say anything . . . I'm going to kill you and kill your mother." The defendant asked Algarin-Santiago to deposit the stolen checks in her banking account, but Algarin-Santiago refused, and so one of the brothers burned the checks. The brothers continued destroying evidence by burning their clothes and cleaning the get-away car. Thereafter, Santiago and Algarin-Santiago left the house, and Santiago disposed of the disassembled murder weapon in three different locations. The night concluded when Santiago and Algarin-Santiago returned home and the brothers concocted an alibi.

The murder remained unsolved for more than a decade. By April, 2010, however, Santiago and Algarin-Santiago were estranged, and the latter gave information about the murder to the police. On April 11, 2010, the police arrested the defendant for his involvement with the murder. The defendant then gave a detailed statement about the murder to the police.

The state charged the defendant, in a two count substitute information, with murder as an accessory and felony murder.[6] The case was tried to a jury. At trial, after the state rested, the court denied the defendant's oral motion for a directed verdict. The defendant then rested his case without presenting any evidence. On May 10, 2012, the jury returned a verdict of guilty on both counts. During a subsequent sentencing hearing, the trial court initially stated that it would sentence the defendant to sixty years imprisonment for each count, with the sentences to run concurrently. At the state's request, however, the court stated that it would instead merge the convictions and attach one sentence of sixty years imprisonment to the felony murder count, and rendered judgment accordingly. This direct appeal followed.

I

We begin with the defendant's claim that the evidence was insufficient to support his conviction of murder as an accessory. Specifically, the defendant argues that, contrary to the requirements of §§ 53a-8 (a) and 53a-54a (a), "[t]here [was] no evidence that [he] had any intent or conscious objective to cause the death of . . . Morales." The defendant contends that, "[e]ven if personal animus made . . . Morales a more attractive victim for this crime in Santiago's mind," it does not necessarily follow that the brothers all shared the specific intent to kill Morales during the robbery.[7] Citing *State* v. *Bennett*, 307 Conn. 758, 774, 59 A.3d 221 (2013), in which this court recently concluded that there was insufficient evidence that a participant in a burglary shared his coparticipant's intent to cause the death of a victim, the defendant asserts that the circumstances

of the present case are even less egregious. In particular, he contends that, unlike the defendant in *Bennett*, there was no evidence adduced at trial that he participated substantially in the events surrounding the murder or carried a weapon to the scene of the crime. In response, the state argues that evidence was indeed presented at trial regarding the defendant's intimate involvement before, during, and after the shooting, and that the jury reasonably could have inferred from that evidence that the defendant shared the intent to cause the death of Morales.[8] Distinguishing *Bennett*, the state also asserts that, in the present case, there was evidence of a shared fraternal motive to kill Morales that was independent of the predicate crime of robbery, namely, to retaliate against Morales for his having shot Santiago in the neck. We agree with the state, and conclude that the evidence was sufficient for the jury to find that the defendant shared the intent to cause the death of Morales.

"In reviewing a sufficiency of the evidence claim, we construe the evidence in the light most favorable to sustaining the verdict, and then determine whether from the facts so construed and the inferences reasonably drawn therefrom, the trier of fact reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt." Id., 763. Although "the jury must find every element proven beyond a reasonable doubt in order to find the defendant guilty of the charged offense . . . each of the basic and inferred facts underlying those conclusions need not be [proven] beyond a reasonable doubt. . . . If it is reasonable and logical for the jury to conclude that a basic fact or an inferred fact is true, the jury is permitted to consider the fact proven and may consider it in combination with other proven facts in determining whether the cumulative effect of all the evidence proves the defendant guilty of all the elements of the crime charged beyond a reasonable doubt. . . .

"Moreover, it does not diminish the probative force of the evidence that it consists, in whole or in part, of evidence that is circumstantial rather than direct. . . . It is not one fact, but the cumulative impact of a multitude of facts which establishes guilt in a case involving substantial circumstantial evidence. . . . In evaluating evidence, the [finder] of fact is not required to accept as dispositive those inferences that are consistent with the defendant's innocence. . . . The [finder of fact] may draw whatever inferences from the evidence or facts established by the evidence it deems to be reasonable and logical." (Internal quotation marks omitted.) *State* v. *Crespo*, 317 Conn. 1, 16–17, A.3d (2015).

The defendant challenges the sufficiency of the evidence only with regard to the intent element of his murder as an accessory conviction. See footnotes 2 and 3 of this opinion. We note that, "[t]o be guilty as an accessory one must *share* the criminal intent and com-

munity of unlawful purpose with the perpetrator of the crime . . . .” (Emphasis added; internal quotation marks omitted.) *State* v. *Sargeant*, 288 Conn. 673, 680, 954 A.2d 839 (2008). In accordance with our murder statute, a conviction of murder as an accessory thus requires, inter alia, that the accessory shared the perpetrator’s “intent to cause the death of another person . . . .” General Statutes § 53a-54a (a). “A person acts ‘intentionally’ with respect to a result . . . described by a statute defining an offense when his conscious objective is to cause such result . . . .” General Statutes § 53a-3 (11).

As we have observed on multiple occasions, “[t]he state of mind of one accused of a crime is often the most significant and, at the same time, the most elusive element of the crime charged. . . . Because it is practically impossible to know what someone is thinking or intending at any given moment, absent an outright declaration of intent, a person’s state of mind is usually [proven] by circumstantial evidence . . . .” (Citation omitted.) *State* v. *Rodriguez*, 180 Conn. 382, 404, 429 A.2d 919 (1980). For example, intent may be proven by “conduct before, during and after [a] shooting. Such conduct yields facts and inferences that demonstrate a pattern of behavior and attitude toward the victim by the defendant that is probative of the defendant’s mental state.” (Internal quotation marks omitted.) *State* v. *Bennett*, supra, 307 Conn. 766.

We briefly revisit the most relevant evidence in this case, being mindful that we must construe it in the light most favorable to sustaining the verdict. Id., 763. At trial, the defendant’s statement to the police was read into evidence. In it, he described how Santiago had “hated” Morales ever since Morales shot Santiago “during a gang fight down at the bar.” Recalling the night Morales was robbed and killed, the defendant explained that each brother had a role to play: he was “going to be the lookout man,” Bermudez was going to approach Morales while armed with a handgun, and Santiago was going to stay inside the getaway car. The defendant stated that, for approximately fifteen minutes, he and Bermudez had lain in wait for Morales to arrive home from working at the bar. When they eventually saw Morales, they sneaked up behind him, with the defendant staying a few paces back “to look out in case something went wrong.” After Bermudez called out to Morales and pointed his gun “right at [Morales’] chest,” the defendant heard two shots and saw Morales fall to the ground. All of the brothers then fled with the stolen bank bag to Santiago’s home, where Algarin-Santiago was told about the shooting. The defendant recalled being rather surprised that Algarin-Santiago was unaware of “what was going on” because “she [was Santiago’s] ride or die chick.”[9] The defendant added that, before he left for the night, everyone “made a pact we would never tell anyone . . . . We all came up with

an alibi."

This evidence was supplemented by the testimony of Algarin-Santiago. She stated that Morales had once shot Santiago in the neck, and that Santiago had stalked Morales during the time that led up to the brothers' reunion on April 10, 1998. According to Algarin-Santiago, on the night of that reunion, she was abruptly woken up to find Santiago, Bermudez, and the defendant in her living room. Algarin-Santiago was informed that Bermudez had just shot Morales, and the defendant warned "if you say anything, we're going to kill you. I'm going to kill you and kill your mother." Frightened for her life, Algarin-Santiago then overheard Bermudez and the defendant discussing the necessity of changing their clothes, "because they had . . . gun residue or whatever it is" and "they wanted to get rid of the evidence." Algarin-Santiago recounted that, while at her home, Bermudez and the defendant burned their clothes, cleaned the getaway car, and talked about getting rid of Bermudez' gun. Algarin-Santiago was with Santiago when he subsequently disposed of the gun and, further, was present when the brothers concluded their night by concocting an alibi.

From the cumulative force of this evidence, the jury reasonably could have found that the defendant shared the intent to cause the death of Morales. The origin of Santiago's long-standing hatred for Morales was amply established and, in turn, it was a fair inference that the brothers were all united in that hatred and sought to avenge Santiago's being shot in the neck by Morales. Some significance could also be attached to the brothers' banding together on the night of their reunion, once they had added strength in numbers to settle an old score. In the eyes of the jury, it was reasonable to find that it was the conscious object of these brothers to ambush and kill Morales—with the potential bounty of a robbery merely being an added "bonus." Cf. *State* v. *Bennett*, supra, 307 Conn. 773 ("[i]n the present case, there was no motive to kill independent of the burglary"); see also *State* v. *Otto*, 305 Conn. 51, 67, 43 A.3d 629 (2012) ("intent to kill may be inferred from evidence that the defendant [had a] motive to kill" [internal quotation marks omitted]); *State* v. *Lopez*, 280 Conn. 779, 795, 911 A.2d 1099 (2007) ("It is not essential that the state prove a motive for a crime. . . . But it strengthens its case when an adequate motive can be shown." [Internal quotation marks omitted.]). Contrary to the defendant's argument, the present case is, thus, quite unlike *Bennett*, wherein a defendant who successfully appealed his murder as an accessory conviction essentially had no preexisting linkage to a victim—much less one that was steeped in violence. See *State* v. *Bennett*, supra, 766 (victim apparently never met defendant, and met perpetrator "under nonconfrontational circumstances" less than one day before murder).

Beyond a shared motive for killing Morales, the jury further could have determined that the defendant's conduct before, during, and after the shooting supported a finding that he possessed the requisite state of mind. Specifically, the evidence showed that the defendant and Bermudez lurked near Morales' house, awaiting an armed confrontation, for approximately fifteen minutes before he arrived. The defendant was, by his own admission, serving as a lookout for Bermudez while he shot and killed Morales. See id., 769 (active participation in murder "through acts beneficial to the principal such as . . . acting as a lookout" common in surveyed cases finding accessorial liability for murder). After fleeing to Santiago's home, the defendant threatened to kill Algarin-Santiago and her mother if she told anyone about that night's shooting. Moreover, the defendant burned the clothing that he wore during the shooting, cleaned the getaway car, and conversed about the need to dispose of the murder weapon and create an alibi. See *State* v. *Sivri*, 231 Conn. 115, 130, 646 A.2d 169 (1994) (destruction of murder evidence indicates consciousness of guilt, "from which a jury may draw an inference of an intent to kill"). Collectively, the defendant's conduct on the night of Morales' murder thus did not amount to "[m]ere presence as an inactive companion [or] passive acquiescence . . . ." *State* v. *Bennett*, supra, 307 Conn. 770. Instead, it was perfectly logical for the jury to find that this proactive conduct on the defendant's part was "a pattern of behavior and attitude toward a victim" that demonstrated a shared intent to cause his death. Id., 766. Accordingly, we conclude that the evidence was sufficient for the jury to find the defendant guilty of murder as an accessory.

## II

We next turn to the defendant's claim that the trial court improperly failed to instruct the jury, sua sponte, on the defense of duress. At the outset, we note that the defendant concedes that he did not request an instruction on the defense of duress at any point during trial.[10] Nevertheless, he contends that he was "entitled" to one, relying on *State* v. *Helmedach*, 306 Conn. 61, 48 A.3d 664 (2012), and *State* v. *Heinemann*, 282 Conn. 281, 920 A.2d 278 (2007), for the proposition that there is a "right to a duress instruction whenever the evidence could support a claim of duress when viewed most favorably to [a] defendant." In response, the state, relying on, inter alia, cases such as *State* v. *Santiago*, 305 Conn. 101, 49 A.3d 566 (2012), and *State* v. *Ebron*, 292 Conn. 656, 975 A.2d 17 (2009), overruled on other grounds by *State* v. *Kitchens*, 299 Conn. 447, 472–73, 10 A.3d 942 (2011), argues that the defendant's claim must fail because "he did not request a duress instruction, and the trial court was not obligated to provide one sua sponte." We agree with the state, and conclude that the trial court did not have an obligation to instruct

the jury, sua sponte, on a defense of duress.

"A challenge to the validity of jury instructions presents a question of law over which [we exercise] plenary review." (Internal quotation marks omitted.) *State* v. *Santiago*, supra, 305 Conn. 191. "The right of a defendant charged with a crime to establish a defense is a fundamental element of due process." *State* v. *Heinemann*, supra, 282 Conn. 298. Moreover, "[i]t is well established that . . . § 53a-14 provides that duress is a defense to a crime." (Footnote omitted.) Id.; see also footnote 5 of this opinion. Duress is not an affirmative defense. See *State* v. *Rouleau*, 204 Conn. 240, 249, 528 A.2d 343 (1987). Thus, if that defense "is raised at a trial, the state shall have the burden of disproving [it] beyond a reasonable doubt." General Statutes § 53a-12 (a). "[T]he assertion and proof of the . . . defense nevertheless remains the defendant's responsibility in the first instance." *State* v. *Ebron*, supra, 292 Conn. 695. It is well settled that "trial courts do not have a duty to charge the jury, sua sponte, on defenses, affirmative or nonaffirmative in nature, that are not requested by the defendant." (Internal quotation marks omitted.) *State* v. *Santiago*, supra, 285. This principle holds true even if the evidence in a particular case "might well have warranted [a particular] instruction, had the defendant requested it appropriately."[11] *State* v. *Ebron*, supra, 695; cf. *State* v. *Preyer*, 198 Conn. 190, 196, 502 A.2d 858 (1985) ("[t]here is no basis, in the law of this state, for the defendant's broad claim that a trial court has an independent obligation to instruct the jury on [an] affirmative defense . . . if the evidence at trial would suffice to support such a charge").

The defendant's reliance on *State* v. *Helmedach*, supra, 306 Conn. 61, and *State* v. *Heinemann*, supra, 282 Conn. 281, for the proposition that the trial court was obligated to instruct the jury on the defense of duress, sua sponte, is misplaced. Those authorities are readily distinguishable from the present appeal and do not dictate that he was "entitled" to a sua sponte jury instruction on the defense of duress. In both of the underlying cases, the juries *did* receive instructions on the defense of duress and, on appeal to this court, the respective defendants merely challenged a particularized aspect of the instructions. See *State* v. *Helmedach*, supra, 77–79 (arguing that duress defense instructions, as given, did not adequately address statutory exception to that defense); *State* v. *Heinemann*, supra, 298 (arguing that duress defense instructions, as given, did not account for "recognized differences between juveniles and adults"). Thus, in asserting that he had a "right" or "entitlement" to a sua sponte jury instruction on the defense of duress, the defendant attaches undue significance to words that he has taken out of the fuller context of these cases.

Our well established approach to jury instructions

and defenses respects "the defendant's right to control the conduct of his own defense . . . ." (Citation omitted.) *State* v. *Ebron*, supra, 292 Conn. 696. Further, it recognizes "the responsibility of the parties to help the court in fashioning an appropriate charge. . . . The ever increasing refinement of our law justifies the cooperation of counsel in stating requests for jury instructions . . . ." (Internal quotation marks omitted.) Id. In light of our controlling precedent and these important, practical considerations, we conclude that it would be inappropriate to place the onus on a trial court to discern, without any request from the parties, the specific defenses on which a jury should be instructed. Accordingly, we conclude that the trial court did not improperly fail to instruct the jury, sua sponte, on a defense of duress.

The judgment is affirmed.

In this opinion the other justices concurred.

[1] The defendant appeals directly to this court pursuant to General Statutes § 51-199 (b) (3).

[2] General Statutes § 53a-8 (a) provides: "A person, acting with the mental state required for commission of an offense, who solicits, requests, commands, importunes or intentionally aids another person to engage in conduct which constitutes an offense shall be criminally liable for such conduct and may be prosecuted and punished as if he were the principal offender."

[3] General Statutes § 53a-54a (a) provides in relevant part: "A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person . . . ."

[4] General Statutes § 53a-54c provides in relevant part: "A person is guilty of murder when, acting either alone or with one or more persons, he commits or attempts to commit robbery . . . and, in the course of and in furtherance of such crime or of flight therefrom, he, or another participant, if any, causes the death of a person other than one of the participants . . . ."

[5] General Statutes § 53a-14 provides: "In any prosecution for an offense, it shall be a defense that the defendant engaged in the proscribed conduct because he was coerced by the use or threatened imminent use of physical force upon him or a third person, which force or threatened force a person of reasonable firmness in his situation would have been unable to resist. The defense of duress as defined in this section shall not be available to a person who intentionally or recklessly places himself in a situation in which it is probable that he will be subjected to duress."

[6] Initially, the state also charged the defendant with murder under a *Pinkerton* theory of conspiratorial liability. See *Pinkerton* v. *United States*, 328 U.S. 640, 647–48, 66 S. Ct. 1180, 90 L. Ed. 1489 (1946); see also *State* v. *Walton*, 227 Conn. 32, 40–54, 630 A.2d 990 (1993) (adopting *Pinkerton* theory of conspiratorial liability as matter of state law). The state, however, elected to drop the *Pinkerton* count prior to trial.

[7] The defendant briefly claims that the evidence did not even establish that the principal, Bermudez, specifically intended to cause the death of Morales. Instead, the defendant contends the evidence showed that "Bermudez shot Morales because Morales was apparently reaching for a weapon" while being robbed. Thus, the defendant argues, the murder of Morales was not the conscious object of *any* of the brothers; rather, it "was a response to . . . Morales' apparent decision to resist, rather than give his bank bag to an armed robber . . . ."

Although this argument is problematic in multiple respects, we need only note that it fails to recognize that the jury was free to give no weight to the limited trial evidence that could support the defendant's version of events. See, e.g., *State* v. *Jackson*, 257 Conn. 198, 209, 777 A.2d 591 (2001) ("[a]lthough some evidence may be inconsistent with the state's theory of the case, the jury is not bound to credit only that evidence to the exclusion of evidence consistent with the state's theory" [internal quotation marks omitted]). One such piece of evidence was a portion of the defendant's own statement to the police, and another was Algarin-Santiago's testimony that Bermudez said he shot Morales during the robbery because he "thought"

Morales had a gun. Aside from these self-serving statements from the defendant and Bermudez, we have not been made aware of any evidence presented at trial that could bolster the defendant's assertion that Morales was only shot after he reached for a weapon. The jury was permitted to and, apparently did, discredit the two specific statements in question. Cf. *State* v. *Brown*, 299 Conn. 640, 648, 11 A.3d 663 (2011) ("[t]he trier of fact may credit part of a witness' testimony and reject other parts" [internal quotation marks omitted]).

[8] The state first argues that we should not reach the merits of the defendant's sufficiency claim because he challenges only his conviction of murder as an accessory, and not his conviction of felony murder. The state observes that, under Connecticut law, those convictions were for "two different means of committing the same crime," namely, murder; see, e.g., *State* v. *John*, 210 Conn. 652, 696, 557 A.2d 93, cert. denied, 493 U.S. 824, 110 S. Ct. 84, 107 L. Ed. 2d 50 (1989); and, further, that the trial court merged the convictions and designated felony murder as the controlling conviction. Relying on several Appellate Court decisions; *State* v. *Brown*, 131 Conn. App. 275, 288, 26 A.3d 674 (2011), aff'd, 309 Conn. 469, 72 A.3d 48 (2013); *State* v. *Longo*, 106 Conn. App. 701, 705–706, 943 A.2d 488 (2008); *State* v. *Hood*, 106 Conn. App. 189, 198–99, 941 A.2d 955, cert. denied, 286 Conn. 921, 949 A.2d 481 (2008); and quoting *State* v. *Beebe*, 131 Conn. App. 485, 497, 27 A.3d 26 (2011), cert. denied, 303 Conn. 921, 34 A.3d 397 (2012), the state asserts that "the effect of the trial court's merging of two convictions, the charges for which set forth alternative ways to commit the same crime, is to forbear the defendant from challenging on appeal the evidentiary sufficiency of the merged offense."

In response, the defendant argues that this court has addressed the merits of sufficiency claims in murder cases with nearly identical postures. See *State* v. *Bennett*, supra, 307 Conn. 777 n.10 (defendant challenged only merged murder as accessory conviction, not controlling felony murder conviction). We agree with the defendant, and see no persuasive reason for departing from our approach in the present appeal. All of the Appellate Court decisions relied on by the state trace their origins to *State* v. *Pulaski*, 71 Conn. App. 497, 505–506, 802 A.2d 233 (2002), wherein a defendant's claim that there was insufficient evidence to support his conviction of operating a motor vehicle while having an elevated blood alcohol content was avoided in one conclusory sentence that was not supported by case law. This line of precedent does not convince us that the defendant should be foreclosed from raising a sufficiency claim with respect to his murder as an accessory conviction which, despite being merged with his felony murder conviction, still appears on his publicly accessible criminal record as a separate conviction.

We do note that in *State* v. *Miranda*, 317 Conn. 741, 742–43,     A.3d (2015), we recently concluded that vacatur—not merger—is the appropriate remedy when a defendant is unlawfully convicted of a cumulative homicide offense arising from the killing of a single victim. Because the defendant has not raised a challenge in this appeal to the form of the judgment, however, we do not disturb it.

[9] We note that the fact finder was free to decide whether this statement was inconsistent with the defendant's characterization of the plot against Morales as one that developed on a whim during the night of April 10, 1998—after the brothers were already out on the town together.

[10] Moreover, the defendant concedes that his claim of instructional error was not preserved at trial. He argues, however, that we should review his unpreserved claim pursuant to *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), because he did not waive it at trial under *State* v. *Kitchens*, 299 Conn. 447, 482–83, 10 A.3d 942 (2011). We need not address the intricacies of this argument, though, because even if we assume, without deciding, that the defendant's claim was not waived under *Kitchens*, he nevertheless was not entitled to a sua sponte jury instruction on the defense of duress.

[11] We note that the defendant argues on appeal that the record contains evidence that could support a defense of duress. As explained by the text that accompanies this footnote, however, it is not presently necessary for this court to reach any substantive conclusions about whether the record could adequately support a defense of duress.